Herbert CHEN and Derek Sheeler, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Robert HOWARD–ANDERSON, Steven Krausz, Robert Abbott, Robert Bylin, Thomas Pardun, Brian Strom, Albert Moyer, Jeanne Seeley, And Occam Networks, Inc., Defendants.

C.A. No. 5878–VCL.

Court of Chancery of Delaware.

Submitted: Jan. 10, 2014.

Decided: April 8, 2014.

Robert J. Katzenstein, David A. Jenkins, Michele C. Gott, Smith, Katzenstein & Jenkins LLP, Wilmington, Delaware; Eduard Korsinsky, Michael H. Rosner, Levi & Korsinsky, LLP, New York, New York; Attorneys for Plaintiffs.

Peter J. Walsh, Jr., Matthew D. Stachel, Potter Anderson & Corroon LLP, Wilmington, Delaware; Jerome F. Birn, Jr., Ignacio E. Salceda, Gregory L. Watts, Wilson Sonsini Goodrich & Rosati, P.C., Palo Alto, California; Attorneys for Defendants.

## OPINION

LASTER, Vice Chancellor.

In September 2010, Occam Networks, Inc. ("Occam" or the "Company") announced an agreement and plan of merger with Calix, Inc. (the "Merger Agreement"). The Merger Agreement called for Calix to acquire Occam through a merger in which each share of Occam common stock would be converted into the right to receive 0.2925 shares of Calix common stock and $3.83 in cash (the "Merger"). The Merger closed in February 2011. The plaintiffs contend that the defendants breached their fiduciary duties by (i) making decisions during Occam's sale process that fell outside the range of reasonableness and (ii) issuing a proxy statement for Occam's stockholder vote on the Merger (the "Proxy Statement") that contained materially misleading disclosures and material omissions.

After discovery, the defendants moved for summary judgment. The defendants ask the court to rule as a matter of law that they did not breach their fiduciary duties. Alternatively, the defendants who were Occam directors contend that the evidence at most could support a breach of the duty of care, for which a provision in Occam's certificate of incorporation exculpates them from liability (the "Exculpatory Provision").

As to the sale process claims, the director defendants' motion for summary judgment is granted. When the evidence is analyzed for purposes of Rule 56, with enhanced scrutiny as the standard of review, the record supports an inference that certain decisions fell outside the range of reasonableness. Nevertheless, the plaintiffs failed to develop sufficient evidence to support an inference that the directors acted with an improper motive. The Exculpatory Provision therefore insulates the director defendants from liability. The re-

maining defendants were officers who cannot invoke the Exculpatory Provision.

As to the disclosure claims, the motion for summary judgment is denied. When the evidence is analyzed for purposes of Rule 56, the record supports an inference that the Proxy Statement contained materially misleading disclosures and material omissions. The director defendants again invoke the Exculpatory Provision, but the record supports an inference that the defendants knew about the disclosure problems before approving the Proxy Statement. In addition, the defendants engaged in questionable conduct during discovery sufficient to support an inference that they sought to conceal evidence about potential disclosure issues until after the Merger closed. At this stage of the case, the defendants' conduct reinforces the inference of *scienter*. Summary judgment on the disclosure claims is therefore denied. A trial is both necessary and desirable to inquire into and develop the facts more thoroughly before seeking to apply the law.

## I. FACTUAL BACKGROUND

The record for the defendants' summary judgment motion fills many binders, and the parties have submitted what are effectively post-trial briefs replete with extensive evidentiary citations. Each side weaves a tale out of the evidence and draws its own inferences from the documents and testimony. On a motion for summary judgment, the court cannot weigh the evidence, decide among competing inferences, or make factual findings. For purposes of this decision, Rule 56 requires that the evidence be construed in favor of the non-movant plaintiffs. What follows is therefore predominately the plaintiffs' side of the story.

## A. Occam

Before the Merger, Occam was a publicly traded Delaware corporation based in Santa Barbara, California. Its stock traded on NASDAQ under the symbol OCNW. Occam developed, marketed, and supported products for the broadband access market.

Defendants Robert Howard–Anderson, Steven Krausz, Robert Abbott, Robert Bylin, Thomas Pardun, Brian Strom, and Albert Moyer constituted Occam's board of directors (the "Board"). Howard–Anderson also served as Occam's President and CEO. The other six directors were facially independent and disinterested outsiders. Two directors—Krausz and Abbott—were affiliated with investment funds that together held approximately 25% of Occam's common stock. Krausz, who had served as an Occam director since 1997 and as Chairman of the Board since 2002, was a general partner at U.S. Venture Partners ("USVP"). Together with its affiliates, USVP beneficially owned 15% of Occam's common stock. Abbott, who had served as an Occam director since 2002, was a general partner at Norwest Venture Partners ("Norwest"). Together with its affiliates, Norwest beneficially owned nearly 10% of Occam's common stock.

Another key player at Occam was defendant Jeanne Seeley, who had served as Occam's CFO since May 2008. Seeley was intimately involved in the process leading to the Merger. She was the person "running the deal" for Occam. Seeley Tr. at 181.

## B. The Broadband Access Equipment Market

Analysts in the early 21st century divided the North American market for broadband access equipment into three tiers based on the size of the telecom companies who were the target customers. Occam primarily sold equipment to the Tier 3 segment, where the customers consisted of small rural service providers, many of whom relied on government subsidies. Occam had approximately 20–30% of the Tier 3 market at the time of the Merger. Occam had barely penetrated the Tier 2 segment, which consisted of larger service providers, and had no presence in the Tier 1 segment, which consisted of the largest service providers.

Calix is a Delaware corporation based in Petaluma, California. Calix did not go public until March 2010, after which its stock traded on the New York Stock Exchange under the symbol CALX. Like Occam, Calix manufactured broadband access equipment. Calix had approximately 30–40% of the Tier 3 segment. Unlike Occam, Calix had a significant presence in the Tier 2 segment.

Adtran, Inc. is a Delaware corporation based in Huntsville, Alabama. Like Occam and Calix, Adtran manufactured broadband access equipment. Adtran primarily operated in the Tier 1 and Tier 2 segments.

## C. Occam Expands Into The Tier 2 Segment.

In January 2008, Occam won its first Tier 2 customer, FairPoint Communications, Inc. Occam took the business from Adtran, FairPoint's incumbent supplier. The win demonstrated Occam's ability to successfully compete against larger access equipment suppliers, like Calix and Adtran.

Occam also was circling TDS Telecom ("TDS"), another important Tier 2 customer. TDS historically used Calix as its exclusive supplier, but TDS had become dissatisfied with Calix and decided to become a two-supplier company. Going for-

ward, TDS would split its purchases between Calix and a second vendor. Occam had a good shot at becoming the second vendor.

## D. Krausz Explores A Potential Transaction With Calix.

In early 2009, Krausz had several calls with Carl Russo, Calix's CEO, about a potential transaction between Occam and Calix. On March 13, Krausz reported to the Board on his activities. According to the minutes,

> Mr. Krausz led a discussion concerning his recent meeting with [Calix] relating to a potential strategic transaction. A discussion ensued concerning the potential opportunities such a transaction would present to the Company and its stockholders as well as a discussion of potential risks and challenges. Following further discussion, the Board requested that Mr. Howard–Anderson and Ms. Seeley evaluate the operational and financial opportunities presented by the potential transaction and that they make an assessment of any related operational, financial and legal challenges. The board agreed to reconvene telephonically the following week.

Defs.' Mot. Ex. 27. At a follow-up meeting on March 20, "the Board determined that formal discussions with [Calix] were not appropriate at this time but encouraged management to continue an informal dialogue to the extent possible." Defs.' Mot. Ex. 28. After the Board meeting, Krausz contacted Russo and explained Occam's position.

In April 2009, Occam retained Jefferies & Company, Inc. for advice on strategic alternatives. The Board believed that Occam needed to increase the scale of its business to compete. Options to increase scale included organic growth, acquisitions, or a combination with another company.

On April 22, Jefferies gave the Board a presentation on market dynamics, the valuation environment, and potential alternatives.

## E. Occam Evaluates A Range Of Strategic Alternatives.

During the summer of 2009, Occam continued working with Jefferies to evaluate a range of strategic alternatives. Krausz remained in contact with Russo and sought to keep Calix interested in a potential combination.

On July 31, 2009, Adtran's CFO called Howard–Anderson to discuss a potential combination and to invite Howard–Anderson to visit Adtran's corporate headquarters in Huntsville, Alabama. After the call, Adtran sent Occam a non-disclosure agreement. Occam never signed it, and Howard–Anderson did not take Adtran up on the invitation to visit Huntsville.

In August 2009, Jefferies reached out to Keymile International GmbH, a private European manufacturer of broadband access systems, to explore a potential acquisition. Later that month, on August 25, the Board met and discussed the Company's alternatives. On August 31, Krausz sent an email to the Board saying that he planned to call Russo as soon as Occam was able to settle a class action lawsuit stemming from an accounting restatement in 2007.

On September 1, 2009, Krausz told Howard–Anderson that he had spoken with the CEO of Zhone Technologies. Occam had identified Zhone as a potential transaction partner. Krausz reported that Zhone was "open to talking," and he suggested Howard–Anderson meet with Zhone. Defs.' Mot. Ex. 29. Zhone, however, wanted to be the acquirer. Occam saw this as a

"deal killer." Defs.' Mot. Ex. 23 at OCNX0001097.

On September 10, 2009, Occam issued a press release announcing that it had entered into a memorandum of understanding to settle the stockholder class action. Krausz promptly reached out to Russo by email, stating: "Give me a call when you have a chance. We have resolved the issues discussed before and [it's] probably time to talk if it is still of interest." Pls.' Opp'n Ex. 12. Russo apparently was still interested because, on September 21, Russo and Krausz spoke about a potential transaction.

On October 6, 2009, Howard–Anderson and Seeley met with the CFO of Keymile in Geneva, Switzerland. They scheduled a meeting for December 9 to further discuss a possible deal.

On October 15, 2009, Russo proposed to Krausz that Calix buy USVP's and Norwest's stakes in Occam. At the time, Calix was getting ready for its IPO, so Calix could not discuss a merger. But Calix was interested in a transaction with Occam, and Russo saw the purchase as "a leg up on acquiring Occam" after the IPO. Pls.' Opp'n Ex. 14. The purchase did not occur.

On November 13, 2009, Howard–Anderson asked Adtran whether it was still interested in pursuing an acquisition. Adtran again suggested an in-person meeting in Huntsville. This time Howard–Anderson agreed, and a meeting was scheduled for December.

## F. The Board Authorizes Occam To Approach Potential Acquisition Targets.

On November 18, 2009, the Board met to evaluate Occam's alternatives. Jefferies reviewed six potential acquisition candidates, including Keymile, and the Board authorized management to make contact with them. Meanwhile, on November 21, Calix filed its preliminary registration statement for its IPO.

In early December, Howard–Anderson and other Occam representatives met in Europe with Keymile's management. In mid-December, Howard–Anderson met with Adtran representatives in Huntsville. During the visit, Adtran and Occam executed a non-disclosure agreement. James Matthews, Adtran's CFO, testified that Adtran "would have had a meeting earlier than [December] if Occam had ... an earlier interest for lack of a better term." Matthews Tr. at 164.

In an email on January 3, 2010, Howard–Anderson followed up with Adtran to get their thoughts on next steps. Howard–Anderson told Adtran that there was a short "window of opportunity to pursue something together" and that as January progressed, Occam would pursue other strategic alternatives. Defs.' Mot. Ex. 31. Adtran's CFO responded that Adtran was "continuing to review the opportunity" and had "scheduled an internal meeting for early next week to contemplate further steps." Id.

On January 29, 2010, the Board met again. Howard–Anderson and Seeley reported on discussions with Keymile. Jefferies provided an updated analysis of a Keymile acquisition. The Board instructed management to continue discussions with potential transaction partners.

On February 17, 2010, Occam entered into a superseding non-disclosure agreement with Adtran. Two days later, senior executives of Adtran and Occam met in Denver, Colorado. Occam made a 68–page presentation about its products and finances. Adtran's executives told Occam that they would "internalize" the information and get back to Occam the following week. Defs.' Mot. Ex. 34 at OCNX0002344.

From Occam's standpoint, the meeting with Adtran was not encouraging. Howard–Anderson questioned Adtran's seriousness about making a bid, and he told the Board that he came away from the meeting "with more concern that they appear to [be] acting only opportunistically and may be taking advantage of fishing for free info on us." *Id.* at OCNX0002343. Adtran perceived Occam's negativity and questioned whether Occam was willing to sell. An internal Adtran presentation dated March 2, 2010, titled "[Occam] Review" drew the conclusion that Occam was "[n]ot pursuing for sale strategy" and was "[b]usy with buy side strategy; not focused on sell side." Pls.' Opp'n Ex. 21 at ADTRAN0002066.

In early March 2010, Adtran's CFO called Howard–Anderson to get further information for use in modeling Occam's revenue. Seeley had a call with the Adtran representatives, provided the requested information, and told the Adtran representatives that Occam was engaged in "ongoing, time sensitive, strategic plan efforts and that [Occam was] in a parallel process." Defs.' Mot. Ex. 35. Seeley then reported to the Board that "Adtran know[s] the next step is theirs and that it needs to be purposeful." *Id.* After that, Howard–Anderson received a voicemail from Adtran's CEO on March 16 saying that Adtran needed more time to finish "crunching their numbers." Defs.' Mot. Ex. 36. Howard–Anderson told the Board that Adtran's "[t]iming [was] starting to arouse [his] suspicions." *Id.* On March 24, Howard–Anderson and Adtran's CFO spoke again, but no offer was forthcoming.

On March 26, 2010, Howard–Anderson and Seeley had another call with Adtran's representatives. Adtran wanted even more information to help it model Occam's revenue. This time, Howard–Anderson and Seeley told Adtran to use publicly available projections. The Adtran representatives explained that because Adtran had little penetration in the Tier 3 segment, it needed information to understand the effect of a federal broadband stimulus program on Occam. The Occam representatives declined to provide anything beyond what was publicly available.

On April 21, 2010, Howard–Anderson followed up with Adtran. Adtran said it was "still actively interested in pursuing Occam" but cautioned that it was pursuing other alternatives. Defs.' Mot. Ex. 37. Adtran told Howard–Anderson that it had engaged a consultant, but that it had not hired an investment banker. Howard–Anderson told Adtran that Occam was "full-steam ahead on [its] strategic initiatives." *Id.* The next day, he reported to the Board on these discussions.

## G. Occam Creates The April Projections.

In early April 2010, Seeley asked Russ Sharer, the Vice President of Marketing, to create a set of revenue projections for Occam for 2010, 2011, and 2012. Sharer was one of Occam's longest-tenured employees, and his responsibilities included "produc[ing] models regarding revenue, revenue assumptions, [and] the market." Seeley Tr. at 58. He "knew the market very well." *Id.* At the time, only two public analysts followed Occam: George Notter of Jefferies and Tim Petrycki of Jesup & Lamont, Inc. Neither analyst had published an estimate of Occam's 2012 revenue.

On April 30, 2010, Sharer sent Seeley a final version of his spreadsheet (the "April Projections"). To develop the April Projections, Sharer used a top-down methodology, and he forecasted revenue of $115.6 million, $177.9 million, and $193.5 million for 2010, 2011, and 2012, respectively. Sharer's forecast also projected a small

increase in Occam's market share, from 18% in 2010 to 20% in 2012. Revenue estimates from the federal broadband stimulus program were projected to more than double from $31.5 million in 2010 to $68.8 million in 2011, then fall to $59.4 million in 2012. The model also predicted strong growth in Occam's international revenue.

The April Projections substantially exceeded the estimates that Adtran derived for Occam based on publicly available information. Adtran modeled Occam's revenue at $110.7 million for 2011 and $105.2 million for 2012. Adtran later increased its estimates to $130.6 million for 2011 and $124.1 million for 2012. At this stage of the proceedings, it is reasonable to infer that if Howard–Anderson and Seeley had provided Adtran with the April Projections once they were created rather than referring Adtran only to publicly available information, then Adtran would have valued Occam more highly and been a more ardent suitor.

## H. Occam Continues Its Discussions With Keymile And Calix.

In contrast to its cool reaction to Adtran, Occam had warmer interactions with other potential strategic partners. In early May 2010, Seeley discussed valuation with Keymile, and Krausz reconnected with Russo about a potential transaction with Calix. Calix had its completed IPO in March, selling 6.33 million shares at $13 per share in an offering underwritten by Jefferies, Goldman Sachs, and Morgan Stanley. Afterwards, Krausz emailed Howard–Anderson to report on his "nice chat" with Russo and Russo's "interest[ ] in having coffee." Pls.' Opp'n Ex. 27. Krausz asked if the meeting should wait until after the next Board meeting. Howard–Anderson suggested having the conversation beforehand.

On May 13, 2010, Krausz and Russo met and discussed a potential transaction between Occam and Calix. On May 19, both Krausz and Howard–Anderson met with Russo and discussed a potential transaction. On May 24, Howard–Anderson and Russo met again. Three days later, Occam entered into a non-disclosure agreement with Calix. The next day, Calix sent Occam an initial term sheet contemplating a stock-for-stock merger that valued Occam at $155.6 million, or $7.02 per share. Calix asked for an exclusive negotiation period of approximately 30 days.

An internal Calix presentation dated May 28, 2010, suggests that Calix was willing to pay significantly more for Occam. The presentation derived a valuation range of $9.19 to $12.87 per share and observed that "anything less than $9.00 represents a good value." Pls.' Opp'n Ex. 33 at CALIX001267. The presentation also observed that "[a]nything under $9 per share is very accretive." *Id.* at CALIX001269. In addition, the presentation suggests that Calix had inside information about Occam. The presentation stated that "[t]here is clearly a schism in [Occam's] board" and that Occam's "[g]rowth strategy has proved ineffective." *Id.* It explained that "USVP and [Norwest] are the only investor/board members" and "[t]hey want to ride a different stock." *Id.* The presentation declared that Calix would "exploit this schism by subtly playing to the 25% shareholder(s) on the board." *Id.*

At this procedural stage, it is reasonable to infer that Krausz provided Russo with the information that appeared in the Calix management presentation. In the weeks before the presentation, Krausz had communicated several times with Russo, as he had throughout Occam's sale process. At the time of the presentation, Krausz had recently polled the Occam directors on their thoughts about Occam's strategic op-

tions, and he had received an email from Pardun expressing a preference for an all-cash deal with Adtran. The content of the presentation, including the comments about what USVP and Norwest wanted, suggests it came from Krausz. At this procedural stage, it is reasonable to infer that the information in the presentation was accurate, that USVP and Norwest were interested in exiting from their Occam investment, and that Krausz favored a transaction with Calix as his preferred means of achieving that goal.

On May 30, 2010, the Board met to discuss Calix's initial term sheet and the status of discussions with Keymile. The Board authorized Seeley to deliver a proposed term sheet to Keymile and directed management to give Calix comments on its proposal. The Board instructed management to continue discussions with Calix, Keymile, and Adtran.

On June 1, 2010, Occam proposed to acquire Keymile for $80 million. On June 4, Howard–Anderson and Russo spoke about the Calix bid. Howard–Anderson made a point of raising management's change-in-control severance agreements and confirming that they would be honored. On June 10, in response to feedback from Occam, Calix submitted a revised term sheet that increased the total purchase price to $156 million, or $7.04 per share, to be paid in a mix of cash and stock. The Board met that same day and reviewed the Calix offer, the status of negotiations with Keymile, and the status of discussions with Adtran.

## I. Occam Creates The June Projections.

In May 2010, having created the April Projections, Sharer sent them to Seeley. Seeley in turn forwarded them to Imelda Farrell, Occam's Director of Financial Planning and Analysis, who reported to Seeley. Seeley wrote that she and Howard–Anderson had reviewed the model and wanted Farrell to use the April Projections "to model out the rest of the P & L and cash flow." Defs.' Mot. Ex. 89. It is reasonable to infer at this stage of the proceedings that Howard–Anderson and Seeley regarded the April Projections as reasonable given that they did not ask for any changes and told Farrell to use them for further modeling.

As requested, Farrell used the April Projections to develop a revenue model for Occam. In June 2010, Farrell finished revising the model. The revised version lowered the revenue forecasts for 2010 from $115.6 million to $100.2 million, for 2011 from $177.9 million to $165.8 million, and for 2012 from $193.5 million to $182.3 for 2012 (the "June Projections"). Pls.' Opp'n Ex. 34; Seeley Tr. at 72. On June 8, she sent the model to Seeley.

The June projection of $165.8 million in revenue for 2011 was substantially higher than the estimates of the two public analysts who followed Occam. Notter, the analyst from Jefferies, projected Occam's 2011 revenue at $113.7 million. Petrycki, the analyst from Jesup & Lamont, projected Occam's 2011 revenue at $140.7 million. Neither had published a revenue projection for 2012.

Likewise, the June Projections of $165.8 million in revenue for 2011 and $182.3 million in 2012 were materially higher than Adtran's internal projections for Occam of $110.7 million in 2011 and $105.2 million in 2012. They also materially exceeded higher projections for Occam that Adtran later would create of $130.6 million for 2011 and $124.1 million for 2012. As with the April Projections, it is reasonable to infer that if Adtran had received the June Projections, then Adtran would have valued Occam more highly and been a more persistent suitor.

Between June 16 and 21, 2010, Jefferies held periodic discussions with Calix's investment banker, Morgan Stanley, regarding Calix's valuation of Occam. On June 21, Russo met with Howard–Anderson and Seeley and covered the same subject. During these discussions and meetings, Occam provided Calix with a 2011 revenue estimate of $113.7 million, consistent with the lower of the two public analyst projections. Occam did not provide Calix with the June Projections, which estimated 2011 revenue at $165.8 million.

Also during this period, Jefferies touched base with Adtran. The lead banker at Jefferies described Adtran's CEO as "very interested" and remarked that Adtran believed that it had reached a "common understanding on price" with Occam. Pls.' Opp'n Ex. 38.

## J. The Late June Board Meetings And The 24–Hour Market Check

On June 23, 2010, Calix submitted a revised term sheet increasing the aggregate merger consideration to $171.1 million, or $7.72 per share. That same day, Keymile expressed interest in being acquired by Occam, subject to some changes in the terms. Defs.' Mot. Ex. 51. Adtran confirmed its interest in buying Occam, and on June 24, Adtran sent a letter of intent proposing an all-cash offer at a 30–35% premium to Occam's trading price. Defs.' Mot. Ex. 52. Using the midpoint of the range, this equated to an offer of $8.60 per share, representing a premium of approximately 11% over Calix's bid. Adtran asked for an exclusive negotiating period that would extend through mid-July. *Id.*

On June 24, 2010, the Board met to consider the various alternatives available to Occam. The Board identified three principal alternatives: a cash-and-stock merger with Calix, a cash sale to Adtran, or remaining independent with a potential acquisition of Keymile. Jefferies provided a presentation that addressed the Calix and Adtran alternatives. Although the bid from Adtran was nominally higher, Jefferies described the two offers as equivalent for "illustrative purposes." Defs.' Mot. Ex. 44 at OCNX0003203. In his deposition, Krausz could not recall if the Board ever knew that Adtran's bid was 11% higher. Krausz Tr. at 71–75.

For purposes of its financial analysis, Jefferies used a revenue estimate of $113.7 million for 2011, which was the lower of the two revenue forecasts by public analysts. Jefferies used a figure of $98.8 million for 2010. The April Projections forecasted revenue of $115.6 million for 2010, $177.9 million for 2011, and $193.5 million for 2012. The June Projections forecasted revenue of $100.2 million for 2010, $165.8 million for 2011, and $182.3 million for 2012. It is reasonable to infer at this stage of the proceedings that if Jefferies had used management's internal projections, the sale alternatives would have been less attractive and the standalone alternative more attractive.

The Board directed management to continue pursuing all three alternatives. On June 25, 2010, Seeley reported to the Board that Adtran planned to send a revised proposal by June 30 and that Calix asked to make a presentation to the Board on either June 30 or July 1.

On June 30, 2010, the Board met again to discuss the three alternatives. Seeley reported that the day before, Adtran had told Jefferies it was "still very much moving forward" and understood that Occam needed an offer by June 30 or July 1, the earlier the better. Pls.' Opp'n Ex. 46. Russo then joined the meeting and made a presentation about Calix and its proposal. After the meeting, the Board instructed Howard–Anderson and Jefferies to give Adtran a 24–hour deadline to make a bid.

Howard–Anderson called Adtran's CFO and gave him the ultimatum. Adtran's CFO described Howard–Anderson's call as "a 24–hour gun to our head." Matthews Tr. at 128. Howard–Anderson admitted that the deadline likely dissuaded Adtran from bidding. 2 Howard–Anderson Tr. at 150.

The Board also instructed Jefferies to conduct a 24–hour "market check." On July 1, 2010, the Thursday before the July 4th weekend, Jefferies sent emails to the following seven potential buyers: ADC, Alcatel–Lucent, Ciena, Cisco, Huawei, Ericsson, and Juniper. None of the emails mentioned Occam by name. Each email imposed a 24–hour deadline for a response.

Despite the ambiguity of the emails, five of the seven potential buyers stated that they were interested, but that the time frame was too short for a response. One of the larger potential acquirers responded that it might be interested, but it was "starting a full week shut-down" for the July 4th holiday. The potential acquirer asked Jefferies to reach out again after the holiday if the company was in a position to have a discussion. The sixth candidate stated that they were in the midst of an internal evaluation. The seventh did not respond in time. Also on July 1, Adtran told Jefferies that it would not move forward with a revised bid for Occam within the 24–hour time frame Occam had provided.

### K. Jefferies Finally Asks For Management Projections.

At 6:33 p.m. on July 1, 2010, after sending out the "market check" emails, a banker from Jefferies sent an email to Seeley about projections for 2011 and 2012. He stated, "We are updating our analysis, and we wanted ... to see if there were longer-term projections for [Occam] available. George Notter [the Jefferies analyst] only provides estimates through CY11, so we went ahead and projected CY12 and CY13. Let us know if these look reasonable." Pls.' Opp'n Ex. 52 at J1795. Jefferies had been advising Occam on its strategic alternatives for months, including on its negotiations with potential acquirers, yet Jefferies had never before obtained internal management projections from Occam.

The Jefferies analysis used $113.7 million as its revenue projection for 2011 and $130.7 million for 2012. Seeley responded by sending Petrycki's analyst report and stating, "Top line growth for 2011 looks light given stimulus. You might want to look at the attached and apply a growth rate on a higher 2011 base." Pls.' Opp'n Ex. 53. She did not give Jefferies the June Projections.

On July 2, 2010, the Jefferies banker replied to Seeley's July 1 email stating, "Attached are updated projections. If possible tomorrow morning, let us know if these look reasonable. One of the board members had requested additional analysis on 2012 for [Calix] and [Occam], so we are expanding the forecast for [Occam] ( [Calix] has equity research through 2012)." Pls.' Opp'n Ex. 54 at J001774. The attached projections forecasted $140.7 million in revenue for 2011 and $180.8 million in revenue for 2012. Id. at J1777. Seeley responded that those "[l]ook[ed] reasonable." Pls.' Opp'n Ex. 55. She did not provide the June Projections. Nevertheless, the Jefferies 2012 revenue figure came close to the June Projections forecast of $182.3 million in 2012.

### L. The Board Approves Exclusivity With Calix.

Later on July 2, the Board met. Jefferies reported that Adtran had "[d]eclined to pursue on [the] suggested timetable." Defs.' Mot. Ex. 57 at OCNX0000769. Jefferies also reported on the results of the

24–hour market check, noting that five of the seven potential acquirers expressed interest in a transaction, but indicated that the time frame was too short. *Id.*

Jefferies then presented an updated analysis of the Calix and Keymile alternatives. The presentation included valuation metrics that used new projections of $109.5 million in revenue for 2010, $140.7 million for 2011, and $180.8 million for 2012. These forecasts exceeded by a considerable margin the projections provided to the Board on June 24, with an increase of 11% for 2010 and an increase of 24% for 2011. There is no indication that anyone explored the differences with the Board or addressed how the higher revenue figures could affect the analysis of strategic alternatives.

The Board authorized management to respond to Calix, and on July 4, 2010, Occam sent Calix a revised term sheet. Occam did not counter on price and made no changes to Calix's aggregate offer of $171.1 million. Occam did propose that the price per share assume that that all vested management equity awards would be exercised and paid out in the deal. On July 13, Calix sent back a revised term sheet and exclusivity agreement. The only changes were to the proposed terms of the exclusivity.

The Board met the next day to consider Calix's revised proposal. The Board directed management to enter into the exclusivity agreement based on the term sheet. Russo emailed his board, saying, "I am very happy with the outcome ... I believe it is a very key deal for us and at a very attractive price." Pls.' Opp'n Ex. 61.

## M. Occam Outperforms.

By July 2010, Occam had made considerable headway with TDS, a potential Tier 2 customer, including a "verbal" win to supply equipment to TDS's Union, New Hampshire property. Pls.' Opp'n Ex. 31 at OCNX0013811. In the jargon of the trade, this was a "First Office Application," which refers to the phase when actual revenue generating traffic begins running over an equipment provider's network. It is usually the last stage before mass deployment. By early August 2010, TDS and Occam were contemplating a wide range of new opportunities, actively discussing plans for deployment, and negotiating pricing.

On August 11, 2010, the Board met again. By this time, the Board and management realized that Occam's third quarter results were tracking considerably ahead of expectations. On August 6, the exclusivity agreement expired when Calix failed to reconfirm its intention to proceed with the transaction at the price in the term sheet. This gave the Board an opportunity to contact other bidders or use that threat to re-open negotiations with Calix. Without contacting Adtran or any other potential partners, and without using the improved results to revisit the question of price, the Board authorized management to extend the exclusivity period. The Board also approved amendments to indemnification agreements between Occam and Krausz and Abbott, the two venture capital directors on the Board. The amendments provided that any indemnification obligations owed by Occam to those two directors would take priority over any indemnification obligations owed to the directors by their venture capital firms.

## N. The August Projections

In mid-August 2010, Calix asked for Occam's management projections for Morgan Stanley to use in its fairness analysis. Seeley asked Jefferies why Morgan Stanley could not use the two public analyst projections. A Jefferies banker responded:

They (and we) really need to use your internal numbers for projections. An analyst model is a decent proxy but we will need your explicit signoff of the numbers we use as the best internal view of the projections....

It would be ideal to have longer term projections so we can do a DCF, but if they don't exist and you aren't comfortable creating them, we can work within that constraint.

Pls.' Opp'n Ex. 65. Shortly after receiving this response, Seeley emailed Farrell to ask her to "go over/refresh the forecast we have for 2010–2012, as well as the assumptions. I would like to review early Monday morning." Defs.' Mot. Ex. 93 at OCNX0023563.

On Sunday, August 15, 2010, Farrell asked Sharer to revisit Occam's projections. Sharer reduced Occam's market share estimates for 2011 and 2012, which sharply reduced the revenue forecasts for those years. For 2011, he cut Occam's share of the Tier 2 and Tier 3 market from 19% to 15% and Occam's share of the international market from 6.5% to 1.75%. For 2012, he cut Occam's share of the Tier 2 and 3 market from 20% to 16%, the international market from 10% to 2.5%. Farrell used the revised figures to update her own spreadsheet and sent the results to Seeley. Seeley forwarded the numbers to Howard–Anderson.

Between August 17 and 19, Seeley had Farrell continue revising the projections. On August 19, 2010, after receiving approval from Seeley, Farrell sent Jefferies a set of projections that forecast revenue of $99.0 million for 2010, $142.9 million for 2011, and $155.1 million for 2012 (the "August Projections"). The June Projections had forecast revenue of $100.2 million for 2010, $165.8 million for 2011, and $182.3 million for 2012.

### O. Occam Continues To Outperform.

As August progressed, Occam's third quarter results continued to track ahead of estimates. To account for the improvements, Occam increased its third quarter revenue forecast from $26.4 million to $27.8 million, and the fourth quarter revenue forecast from $27.7 million to $28.2 million. Farrell sent Seeley an updated version of the August Projections that accounted for the increases and made adjustments to the expense and margin structure for the balance of 2010, 2011, and 2012.

Farrell then sent Jefferies a revised spreadsheet that included updated projections only for 2010 and 2011 (the "Revised August Projections"). According to Farrell, Seeley instructed her to delete the 2012 projections. For purposes of summary judgment, this testimony must be taken as true.

On August 23, 2010, TDS informed Occam that TDS had been awarded government stimulus funds and invited Occam to bid on a long list of broadband stimulus projects. Only vendors on TDS's "short list" were invited to bid on the projects. Pls.' Opp'n Ex. 82. This was a huge achievement for Occam. Management devoted five slides in its August 26 Board presentation to describing the burgeoning TDS relationship.

None of the Occam projections were ever revised to incorporate the successful relationship with TDS. Sharer confirmed in an email dated August 24, 2010, that his estimates did not incorporate "a significant win in Tier 2 with major ($10M per year) impact during the period." Pls.' Opp'n Ex. 82a at OCNX023612. Sharer excluded the revenue because he assumed that Calix would acquire Occam and that TDS then would choose a different firm as its second supplier.

On August 26, 2010, the Board met for its regularly scheduled meeting with management. At the meeting, Seeley provided a finance update that included a report on the improved operating results. The Board discussed the impact of the federal rural broadband stimulus programs on Occam and the overall market. Sharer provided an update on Occam's efforts to establish a presence in markets outside of North America. Management also provided updates on operating matters and product development activities. After management left the meeting, the Board discussed the Calix transaction. About a week later, on August 31, Occam sent the Revised August Projections, which only covered 2010 and 2011, to Calix and Morgan Stanley.

On September 15, 2010, the Board met again to consider whether to approve the deal with Calix. Jefferies opined that the transaction between Occam and Calix was "fair, from a financial point of view" to Occam's stockholders. Defs.' Mot. Ex. 77. The fairness opinion stated that Jefferies had reviewed "certain information furnished to [it] by the Company's management, including financial forecasts *for calendar years 2010 and 2011 only, having been advised by management of the Company that it did not prepare any financial forecasts beyond such period,* and analyses, relating to the business, operations and prospects of the Company." Defs.' Mot. Ex. 1 at B–1 (emphasis added).

There is no explanation in the record for the italicized language, which is contrary to the evidence. The April Projections, June Projections, and August Projections all included financial forecasts for 2012. Jefferies was provided with the August Projections, which included financial forecasts for 2012. Howard–Anderson reviewed the April Projections and the June

Projections. Seeley reviewed all three sets of projections.

The Merger Agreement called for Occam stockholders to receive $3.83 in cash and 0.2925 shares of Calix common stock. At the time of approval, based on the trading price of Calix's shares, the aggregate value of the consideration was $7.75 per share, representing an approximately 60% premium over Occam's trading price. The transaction implied an equity value for Occam of $171 million. The Merger Agreement contained a no-shop clause with a fiduciary out, a four-day match right, and a termination fee of $5.2 million representing approximately 3% of the equity value. The Board resolved unanimously to approve the Merger and recommend it to the Company's stockholders.

**P. This Litigation**

On September 16, 2010, Occam and Calix announced the Merger. Plaintiffs holding approximately 19% of Occam's common stock filed suit on October 6. On January 24, 2011, the court issued a preliminary injunction blocking the parties from proceeding with the stockholder vote on the Merger until corrective disclosures were made. On February 7, Occam made the required disclosures.

Occam's stockholders approved the Merger on February 22, 2011. Out of 21,551,376 issued and outstanding shares, 13.7 million (64%) voted in favor. Of these shares, approximately 5.7 million were obligated to vote in favor pursuant to a support agreement. Of the 15.8 million non-obligated shares, nearly 8 million (50.5%) voted in favor.

On January 6, 2012, this court certified a non-opt out class comprising all of the unaffiliated shares and appointed plaintiffs Herbert Chen and Derek Sheeler as class representatives. During fact discovery, the parties took over 20 depositions and

exchanged over 60,000 pages of documents.

After fact discovery closed, the defendants moved for summary judgment. In support of their motion, the defendants attempted to rely on post-closing events, including Calix's post-closing performance, to show that the Board correctly decided to take the Calix bid rather than try to build greater value as a stand-alone company. Fiduciary decisions are not judged by hindsight. The defendants' actions must stand or fall based on what they knew and did at the time.

## II. LEGAL ANALYSIS

Under Court of Chancery Rule 56, summary judgment "shall be rendered forthwith" if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Ct. Ch. R. 56(c). The moving party bears the initial burden of demonstrating that, even with the evidence construed in the light most favorable to the non-moving party, there are no genuine issues of material fact. *Brown v. Ocean Drilling & Exploration Co.*, 403 A.2d 1114, 1115 (Del. 1979). If the moving party meets this burden, then to avoid summary judgment the non-moving party must "adduce some evidence of a dispute of material fact." *Metcap Sec. LLC v. Pearl Senior Care, Inc.*, 2009 WL 513756, at *3 (Del.Ch. Feb. 27, 2009), *aff'd,* 977 A.2d 899 (Del.2009) (TABLE); *accord Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del.1995).

On an application for summary judgment, "the court must view the evidence in the light most favorable to the non-moving party." *Merrill v. Crothall–American, Inc.*, 606 A.2d 96, 99 (Del.1992). "Any application for such a judgment must be denied if there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or the inferences to be drawn therefrom." *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del.1970).

[T]he function of the judge in passing on a motion for summary judgment is not to weigh evidence and to accept that which seems to him to have the greater weight. His function is rather to determine whether or not there is any evidence supporting a favorable conclusion to the nonmoving party. When that is the state of the record, it is improper to grant summary judgment.

*Cont'l Oil Co. v. Pauley Petroleum, Inc.*, 251 A.2d 824, 826 (Del.1969). "The test is not whether the judge considering summary judgment is skeptical that [the nonmovant] will ultimately prevail." *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1150 (Del.2002). "If the matter depends to any material extent upon a determination of credibility, summary judgment is inappropriate." *Id.* When a party's state of mind is at issue, a credibility determination is "often central to the case." *Johnson v. Shapiro*, 2002 WL 31438477, at *4 (Del.Ch. Oct. 18, 2002). "In such cases, the court should evaluate the demeanor of the witnesses whose states of mind are at issue during examination at trial." *Id.*

"There is no 'right' to a summary judgment." *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del.2002). When confronted with a Rule 56 motion, the court may, in its discretion, deny summary judgment if it decides upon a preliminary examination of the facts presented that it is desirable to inquire into and develop the facts more thoroughly at trial in order to clarify the law or its application.[1]

1. *See, e.g., Cerberus*, 794 A.2d at 1150; *Alexander Indus., Inc. v. Hill*, 211 A.2d 917, 918– 19 (Del.1965); *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del.1962); *Mentor Graphics*

The plaintiffs' claims against the defendants fall under two broad headings: breaches of fiduciary duty relating to decisions during the sale process and breaches of fiduciary duty relating to disclosures in the Proxy Statement. Neither side has argued that the claims against Seeley, who served only as an officer of Occam, should be analyzed differently on the merits than the claims against the other defendants, so this decision assumes without deciding that the same legal principles apply.[2] In addition to seeking summary judgment on the merits, the director defendants invoke the Exculpatory Provision.

## A. The Sale Process Claim

The defendants ask the court to determine as a matter of law that they did not breach their fiduciary duties by deciding to sell Occam to Calix. In the alternative, the director defendants contend that they at most breached their duty of care and are therefore protected by the Exculpatory Provision. Summary judgment based on the Exculpatory Provision is granted in favor of Krausz, Abbott, Pardun, Moyer, Bylin, and Strom.

### 1. The Operative Standard Of Review

■ When determining whether corporate fiduciaries have breached their duties, Delaware corporate law distinguishes between the standard of conduct and the standard of review.[3] "The standard of conduct describes what directors are expected to do and is defined by the content of the duties of loyalty and care. The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct." *In re Trados Inc. S'holder Litig. (Trados II)*, 73 A.3d 17, 35–36 (Del.Ch.2013).

■ "Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness." *Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 457 (Del.Ch.2011). Which standard of review applies will depend initially on whether the board members

---

*Corp. v. Quickturn Design Sys., Inc.*, 1998 WL 731660, at *3 (Del.Ch. Oct. 9, 1998).

**2.** The Delaware Supreme Court has held that "the fiduciary duties of officers are the same as those of directors." *Gantler v. Stephens*, 965 A.2d 695, 709 (Del.2009). The Delaware Supreme Court has not addressed the standard of review that a court should use when evaluating officer decision making. A lively debate exists regarding the degree to which decisions by officers should be examined using the same standards of review developed for directors. *Compare* Lawrence A. Hamermesh & A. Gilchrist Sparks III, *Corporate Officers and the Business Judgment Rule: A Reply to Professor Johnson*, 60 Bus. Law. 865 (2005), *and* A. Gilchrist Sparks, III & Lawrence A. Hamermesh, *Common Law Duties of Non–Director Corporate Officers*, 48 Bus. Law. 215 (1992), *with* Lyman P.Q. Johnson, *Corporate Officers and the Business Judgment Rule*, 60 Bus. Law. 439 (2005). Given how the

parties have chosen to proceed, this decision need not weigh in on these issues and intimates no view upon them.

**3.** *See* William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Function Over Form: A Reassessment of the Standards of Review in Delaware Corporation Law*, 56 Bus. Law. 1287, 1295–99 (2001) [hereinafter *Function Over Form*]; William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of Van Gorkom and its Progeny as a Standard of Review Problem*, 96 Nw. U.L.Rev. 449, 451–52 (2002) [hereinafter *Realigning the Standard*]; *see also* E. Norman Veasey & Christine T. Di Guglielmo, *What Happened in Delaware Corporate Law and Governance from 1992–2004? A Retrospective on Some Key Developments*, 153 U. Pa. L.Rev. 1399, 1416–25 (2005) (distinguishing between the standards of fiduciary conduct and standards of review).

(i) were disinterested and independent (the business judgment rule), (ii) faced potential conflicts of interest because of the decisional dynamics present in particular recurring and recognizable situations (enhanced scrutiny), or (iii) confronted actual conflicts of interest such that the directors making the decision did not comprise a disinterested and independent board majority (entire fairness). The standard of review may change further depending on whether the directors took steps to address the potential or actual conflict, such as by creating an independent committee, conditioning the transaction on approval by disinterested stockholders, or both.[4]

In each manifestation, the standard of review is more forgiving of directors and more onerous for stockholder plaintiffs than the standard of conduct. The numerous policy justifications for this divergence largely parallel the well-understood rationales for the business judgment rule.[5]

In this case, the Board approved a merger in which each publicly held share of Occam common stock would be convert-

ed into the right to receive $3.83 in cash plus 0.2925 shares of Calix common stock. On September 15, 2010, when the directors approved the Merger, the relative value of the two components was approximately 49.6% cash and 50.4% stock. At the preliminary injunction stage, this court applied enhanced scrutiny, citing the divergent interests created in an M & A scenario by the final period problem. *See* Dkt. 70 at 86. *See generally* J. Travis Laster, Revlon *is a Standard of Review: Why It's True and What It Means,* 19 Fordham J. Corp. & Fin. L. 5, 8–18 (2013) [hereinafter *Standard of Review*]. The court denied the application for a preliminary injunction because of a lack of irreparable harm and after balancing the equities. Dkt. 70 at 85. A subsequent Court of Chancery decision held that this transactional structure triggers enhanced scrutiny. *See In re Smurfit–Stone Container Corp. S'holder Litig.,* 2011 WL 2028076, at *12–16 (Del.Ch. May 20, 2011).

■ The fact that the transaction has closed does not cause the standard of review to relax from enhanced scrutiny to

4. *Trados II,* 73 A.3d at 36. This summary focuses on the duty of loyalty, which historically drove the modulations in the standard of review. In *Cede & Co. v. Technicolor, Inc.,* the Delaware Supreme Court held that if a plaintiff pled and later proved gross negligence, *i.e.* conduct sufficient to establish a breach of duty of care under the business judgment rule, then the standard of review would intensify to entire fairness. *Cede & Co. v. Technicolor, Inc. (Technicolor Plenary II),* 634 A.2d 345, 367–68 (Del.1993). Chief Justice Strine argued in an opinion written while serving as a Vice Chancellor that if a corporation has an exculpatory provision and if the plaintiff only seeks damages, then a breach of the duty of care should not elevate the standard of review. *Goodwin v. Live Entm't, Inc.,* 1999 WL 64265, at *24 n. 17 (Del.Ch. Jan. 25, 1999). For more detailed discussions of *Technicolor Plenary II,* see *Function over Form, supra,* at 1301–05 (examining policy implications of decision), *Realigning the Stan-

dard, supra,* at 460–62 (same), and Leo E. Strine, Jr. et. al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law,* 98 Geo. L.J. 629, 673–84 (2010) (analyzing decision's reasoning).

5. *See Function over Form, supra,* at 1296 (explaining divergence between standards of conduct and standards of review); *Realigning the Standard, supra,* at 451–57 (same); *accord* Melvin Aron Eisenberg, *The Divergence of Standards of Conduct and Standards of Review in Corporate Law,* 62 Fordham L.Rev. 437, 444, 461–67 (1993); Veasey & Di Guglielmo, *supra,* at 1421–28; Julian Velasco, *The Role of Aspiration in Corporate Fiduciary Duties,* 54 Wm. & Mary L.Rev. 519, 553–58 (2012). Opinions providing illustrative articulations of the policy rationales include *Brehm v. Eisner,* 746 A.2d 244, 255–56 (Del.2000), and *Gagliardi v. TriFoods International, Inc.,* 683 A.2d 1049, 1052 (Del.Ch.1996).

the business judgment rule. A series of Delaware Supreme Court decisions have applied enhanced scrutiny after transactions have closed. In *Barkan,* one of the Delaware Supreme Court's leading enhanced scrutiny precedents, stockholder plaintiffs challenged a management buyout. *Barkan v. Amsted Indus., Inc.,* 567 A.2d 1279 (Del.1989). After the merger closed, the plaintiffs settled based on their contributory role in generating a pre-closing price increase. Another stockholder objected, contending that the settlement released meaningful claims for what was effectively no consideration. The Court of Chancery approved the settlement, and the objector appealed. One of the questions presented to the Delaware Supreme Court was the standard of review that would have governed the claims. *Id.* at 1286. The Delaware Supreme Court held that "the general principles announced in *Revlon,* in *Unocal* . . ., and in *Moran v.*

*Household International, Inc.* [500 A.2d 1346 (Del.1985) ] . . . govern this case and every case in which a fundamental change of corporate control occurs or is contemplated." *Id.* In other words, the enhanced scrutiny standard of review as elucidated in those three decisions governed the plaintiffs' post-closing claims. *Id.* Other Delaware Supreme Court decisions similarly have held that enhanced scrutiny applies to post-closing breach of fiduciary duty claims.[6] On those occasions when the Delaware Supreme Court has held that enhanced scrutiny did not apply to a particular post-closing scenario, the high court has deployed the same analytical distinctions that apply during the preliminary injunction stage, such as the form of transaction consideration or the absence of a response to a perceived threat.[7] The closing of the transaction has not entered into the analysis.[8] This is perhaps unsurpris-

6. See *Lyondell Chem. Co. v. Ryan,* 970 A.2d 235, 242–44 (Del.2009) (agreeing with Court of Chancery that enhanced scrutiny governed post-closing claim that directors acted in bad faith when approving sale of corporation for cash, but reversing denial of summary judgment on grounds that plaintiffs had not cited evidence to support their theory of bad faith); *McMullin v. Beran,* 765 A.2d 910, 918–20 (Del.2000) (reversing the Court of Chancery's dismissal of a claim that directors had failed to obtain the best value reasonably available in a merger when selling to a third party in a transaction that allegedly satisfied the controlling stockholder's need for liquidity and holding in the context of a post-closing challenge to a cash sale that the directors had the burden to show that they acted reasonably to obtain the best value reasonably available and made a reasonably informed decision to approve the challenged merger); *In re Santa Fe Pac. Corp. S'holder Litig.,* 669 A.2d 59, 71 (Del.1995) (reversing dismissal of post-closing claim that directors had breached their fiduciary duties by adopting unreasonable defensive measures as part of a third-party, arm's-length merger agreement and holding that enhanced scrutiny governed the claim and that the case therefore "differ[ed] from cases

where the presumption of the business judgment rule attaches *ab initio* and to survive a Rule 12(b)(6) motion, a plaintiff must allege well-pleaded facts to overcome the presumption").

7. See, e.g., *Williams v. Geier,* 671 A.2d 1368, 1377 (Del.1996) (lack of unilateral director action in response to a threat); *Santa Fe,* 669 A.2d at 71 (form of consideration); *Arnold v. Soc'y for Sav. Bancorp, Inc.,* 650 A.2d 1270, 1289–90 (Del.1994) (same).

8. This court's decisions also have applied the enhanced scrutiny standard of review in post-closing settings. In *Yanow v. Scientific Leasing, Inc.,* 1991 WL 165304 (Del.Ch. July 31, 1991), Justice Jacobs, then a Vice Chancellor, ruled on a post-closing motion for summary judgment where the defendant directors sought to invoke the business judgment rule. Justice Jacobs explained that "[w]here, as here, issues of corporate control are at stake, the actions of even a disinterested board must satisfy an enhanced level of scrutiny before they will qualify for the deference that courts ordinarily accord to good-faith business judgment." *Id.* at *7. Chief Justice Strine, then a Vice Chancellor, took the same approach in

ing, given that concern about divergent interests in the boardroom is what animates the enhanced scrutiny standard of review. *See* Part II.A.3.b, *infra.* The specter that potential context-dependent or situationally specific conflicts may have undermined a board's decision does not dissipate just because a transaction has closed.

Rather than the fact of closing, what could affect the standard of review for a sale process challenge (at least in my view) would be a fully informed, non-coerced stockholder vote.[9] The defendants have not made this argument, and there is evidence in this case that disclosure deficiencies undermined the vote. *See* Part II.B, *infra.* This decision therefore does not reach the potential effect of a fully informed, non-coerced stockholder vote on the standard of review.

The plaintiffs want the standard of review to escalate. They say the evidence they obtained in discovery after the preliminary injunction phase should cause the

*Goodwin,* 1999 WL 64265, at *5, *7 n. 4, *21–24. Other Court of Chancery decisions similarly have applied enhanced scrutiny to post-closing breach of fiduciary duty claims. *See, e.g., Frank v. Elgamal,* 2014 WL 957550, at *20–21 (Del.Ch. Mar.10, 2014); *In re Answers Corp. S'holders Litig. (Answers II ),* 2014 WL 463163, at *10 (Del.Ch. Feb. 3, 2014); *In re BioClinica, Inc. S'holder Litig.,* 2013 WL 5631233, at *6–7 (Del.Ch. Oct. 16, 2013); *Miramar Firefighters Pension Fund v. AboveNet, Inc.,* 2013 WL 4033905, at *4–8 (Del.Ch. July 31, 2013); *In re Answers Corp. S'holder Litig. (Answers I),* 2012 WL 1253072, at *6 (Del.Ch. Apr. 11, 2012).

**9.** *See In re Morton's Rest. Gp., Inc. S'holders Litig.,* 74 A.3d 656, 663 n. 34 (Del.Ch.2013) ("[I]t is plain that, when disinterested approval of a sale to an arm's-length buyer is given by a majority of stockholders who have had the chance to consider whether or not to approve a transaction for themselves, there is a long and sensible tradition of giving deference to the stockholders' voluntary decision, invoking the business judgment rule standard of review, and limiting any challenges to the difficult argument that the transaction constituted waste."); *In re S. Peru Copper Corp. S'holder Deriv. Litig.,* 52 A.3d 761, 793 n. 113 (Del.Ch.2011) (expressing the view that in the absence of a majority stockholder or *de facto* controller, "the approval of an uncoerced, disinterested electorate of a merger (including a sale) would have the effect of invoking the business judgment rule standard of review"), *aff'd sub nom. Ams. Mining Corp. v. Theriault,* 51 A.3d 1213 (Del.2012); *In re PNB Hldg. Co. S'holders Litig.,* 2006 WL 2403999, at *14 (Del.Ch. Aug. 18, 2006) ("[O]utside the [*Kahn*

*v.*] *Lynch* [638 A.2d 1110 (Del.1994)] context, proof that an informed, non-coerced majority of the disinterested stockholders approved an interested transaction has the effect of invoking business judgment rule protection for the transaction and, as a practical matter, insulating the transaction from revocation and its proponents from liability." (footnote omitted)). For example, in *Malpiede,* the Delaware Supreme Court dismissed a *Revlon* challenge to a cash sale by conducting an analysis of director disinterestedness and independence reminiscent of the business judgment rule. 780 A.2d at 1083–84. But the Delaware Supreme Court in that case also held that the plaintiff had failed to plead any disclosure violations. *Id.* at 1085–88. Consequently a fully informed, non-coerced stockholder majority had approved the transaction, which (in my view) made business judgment review appropriate. *See In re Lukens Inc. S'holders Litig.,* 757 A.2d 720, 736–38 (Del. Ch.1999) (holding that fully informed stockholder vote on a merger triggered business judgment standard of review resulting in dismissal of claim that the directors of a corporation breached their duty of care in selling the corporation); *see also In re Alloy, Inc.,* 2011 WL 4863716, *7–14 (Del.Ch. Oct. 13, 2011) (granting motion to dismiss post-closing challenges to merger in which public stockholders received cash and insiders rolled-over their equity and holding that (i) complaint did not state any viable disclosure claims and (ii) directors had not breached their duties when approving sale after an examination of whether complaint rebutted business judgment rule's presumptions). *See generally* J. Travis Laster, *The Effect of Stockholder Approval on Enhanced Scrutiny,* 40 Wm. Mitchell L.Rev. (forthcoming May 2014).

standard of review to intensify to entire fairness. The only theory laid out clearly in their brief is that a majority of the directors were interested in the Merger or not independent of those who were. *See* Pls.' Opp'n Br. at 45–49. The plaintiffs focus on Howard–Anderson, Krausz, Abbott, Pardun, and Moyer. They do not raise any challenge to Bylin or Strom.

Howard–Anderson was interested in the Merger. He personally received more than $840,500 in benefits from the Merger that were not shared with the stockholders generally, including $272,803 in cash severance and other benefits from a Change of Control Severance Agreement. The Board acted to increase the amounts due under his severance agreement on September 16, 2010, the same day the Merger Agreement was executed. It can be inferred at this procedural stage that the benefits were material to him. *See, e.g., In re Primedia Inc. Deriv. Litig.,* 910 A.2d 248, 261 n. 45 (Del.Ch.2006) (noting that compensation from employment is generally material); *In re Student Loan Corp. Deriv. Litig.,* 2002 WL 75479, at *3 n. 3 (Del.Ch. Jan. 8, 2002) (same).

■ Krausz, Abbott, Pardun, and Moyer were disinterested and independent with respect to the Merger. The plaintiffs

correctly observe that as a general partner of USVP, Krausz faced the dual fiduciary problem identified in *Weinberger v. UOP, Inc.,* 457 A.2d 701, 710 (Del.1983). There, the Delaware Supreme Court held that there was "no dilution" of the duty of loyalty when a director "holds dual or multiple" fiduciary obligations and "no 'safe harbor' for such divided loyalties in Delaware." *Id.* If the interests of the beneficiaries to whom the dual fiduciary owes duties diverge, the fiduciary faces an inherent conflict of interest.[10] But if the interests of the beneficiaries are aligned, then there is no conflict. *See, e.g., Van de Walle v. Unimation, Inc.,* 1991 WL 29303, at *11 (Del.Ch. Mar. 7, 1991).

In this case, the nature of USVP's investment did not cause its interests to diverge from those of the undifferentiated equity and did not create any conflict for Krausz. USVP owned approximately 15% of the outstanding common stock. "Delaware law presumes that investors act to maximize the value of their own investments." *Katell v. Morgan Stanley Gp., Inc.,* 1995 WL 376952, at *12 (Del.Ch. June 15, 1995). When directors or their affiliates own "material" amounts of common stock, it aligns their interests with other stockholders by giving them a "moti-

---

**10.** *See Krasner v. Moffett,* 826 A.2d 277, 283 (Del.2003) ("[T]hree of the FSC directors ... were interested in the MEC transaction because they served on the boards ... of both MOXY and FSC."); *McMullin,* 765 A.2d at 923 ("The ARCO officers and designees on Chemical's board owed Chemical's minority shareholders 'an uncompromising duty of loyalty.' There is no dilution of that obligation in a parent subsidiary context for the individuals who acted in a dual capacity as officers or designees of ARCO and as directors of Chemical." (footnote omitted)); *Rabkin v. Philip A. Hunt Chem. Corp.,* 498 A.2d 1099, 1106 (Del.1985) (holding that parent corporation's directors on subsidiary board faced conflict of interest); *Weinberger,* 457 A.2d at 710 (holding that officers of parent corpora-

tion faced conflict of interest when acting as subsidiary directors regarding transaction with parent); *see also Rales v. Blasband,* 634 A.2d 927, 933 (Del.1993) (explaining for purposes of demand futility that " '[d]irectorial interest exists whenever divided loyalties are present' " (internal quotation marks omitted)); *Goldman v. Pogo.com Inc.,* 2002 WL 1358760, at *3 (Del.Ch. June 14, 2002) ("Because Khosla and Wu were the representatives of shareholders which, in their institutional capacities, [were] both alleged to have had a direct financial interest in this transaction, a reasonable doubt is raised as to Khosla and Wu's disinterestedness in having voted to approve the ... [l]oan."); *Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.,* 532 A.2d 1324, 1336 (Del.Ch.1987) (same).

vation to seek the highest price" and the "personal incentive as stockholders to think about the trade off between selling now and the risks of not doing so." *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 600 (Del.Ch.2010). If the decision is made to sell, "[a] director who is also a shareholder of his corporation is more likely to have interests that are aligned with the other shareholders of that corporation as it is in his best interest, as a shareholder, to negotiate a transaction that will result in the largest return for all shareholders." *Orman v. Cullman*, 794 A.2d 5, 27 n. 56 (Del.Ch.2002); *see In re Mobile Commc'ns Corp. of Am., Inc. Consol. Litig.*, 1991 WL 1392, at *9 (Del.Ch. Jan. 7, 1991) (noting that directors' substantial stockholdings gave them "powerful economic (and psychological) incentives to get the best available deal"), *aff'd*, 608 A.2d 729 (Del.1992). This is not a case where the structure of USVP's security gave it a different return profile and different incentives. *Cf. Trados II*, 73 A.3d at 46–47 (finding that three of the directors faced the dual fiduciary problem because the merger triggered the preferred stockholders' liquidation preference, which gave those directors "a divergent interest in the [m]erger that conflict-

ed with the interests of the common stock").

In an effort to show that USVP had a divergent interest, the plaintiffs note that virtually all of USVP's holdings were owned by a fund scheduled to terminate on December 31, 2009. By the time of the Merger, the fund had been extended for more than a year. The plaintiffs say that, on a motion for summary judgment, the court must infer that USVP and Krausz had an incentive to sell Occam in the near term to a cooperative acquirer like Calix so they could wind down the fund.

Delaware cases recognize that liquidity is one "benefit that may lead directors to breach their fiduciary duties," and stockholder directors may be found to have breached their duty of loyalty if a "desire to gain liquidity ... caused them to manipulate the sales process" and subordinate the best interests of the corporation and the stockholders as a whole.[11] It is not enough, however, for a plaintiff simply to argue in the abstract that a particular director has a conflict of interest because she is affiliated with a particular type of institution. There must be evidence sufficient to permit a finding that the director in fact faced a conflict in the specific case.[12]

---

11. *Answers I*, 2012 WL 1253072, at *7; *see McMullin*, 765 A.2d at 922–23 (reversing grant of motion to dismiss where complaint alleged that controlling stockholder and its director designees sacrificed value in a sale to achieve controlling stockholder's goal of obtaining near-term liquidity and significant component of the transaction consideration in cash); *N.J. Carpenters Pension Fund v. Infogroup, Inc.*, 2011 WL 4825888, at *4, *9–10 (Del.Ch. Sept. 30, 2011) (denying motion to dismiss where the plaintiff alleged that the director who was also a large stockholder sacrificed value in sale because he needed liquidity to satisfy personal debts and fund a new venture); *see also In re TeleCorp PCS, Inc. S'holders Litig.*, Cons.C.A. No. 19260–VCS, at 16 (Del.Ch. June 17, 2002) (TRANSCRIPT) ("What [these large stockholders] weren't entitled to do was to use their influ-

ence as fiduciaries to procure liquidity from AT & T Wireless on the backs of public stockholders in an unfair merger.").

12. *See Morton's*, 74 A.3d at 667 (dismissing complaint challenging sale that was the product of a lengthy and thorough pre-signing market check in which plaintiff conceded that "all logical buyers were made aware ... and that they all had the time and fair opportunity to bid" and rejecting allegation that private equity firm "typically flips companies it invests in every three to five years" and favored a sale to achieve liquidity for the investors in one of its funds and to invest in a new fund); *Trados II*, 73 A.3d at 54 ("At trial, the plaintiff could not rely on general characterizations of the VC ecosystem. The plaintiff had to prove by a preponderance of evidence that Prang

In this case, the evidence does not support a reasonable inference that Krausz and USVP faced a liquidity-driven conflict due to the winding down of the fund. USVP routinely extended its funds, and the fund in question had been extended through March 2012. If USVP was concerned about holding a large block of Occam stock, it could have distributed the Occam shares to its investors. Further undercutting the reasonableness of the inference that USVP faced pressure to exit was Krausz's proposal in April 2010 that USVP invest additional funds in Occam to support an acquisition of Keymile. To the extent Krausz wanted to sell to Calix—and there is reason to believe that he did—the only reasonable inference is that he viewed the transaction as the best value reasonably available for his shares, and by extension for all stockholders. The plaintiffs' theory about Krausz and USVP having a divergent interest did not pan out.

The plaintiffs advanced a similar case against Abbott, who was a general partner at Norwest. As with USVP and Krausz, the nature and structure of Norwest's ownership position in this case did not cause its interests to diverge from the common stock and did not create any conflict for Abbott. Norwest owned nearly 10% of Occam's common stock. The Norwest funds did not have a wind-down issue: They were not scheduled to terminate until 2017.

■ As to Pardun, the plaintiffs argue that he is not independent of USVP. The plaintiffs contend that he relied on USVP for directorships, serving not only as a director of Occam but also on the boards of MaxLinear, Inc. and MegaPath, Inc., where USVP was also a major stockholder and Krausz a director. They also point out that Pardun owned a "sidecar" investment in one of USVP's funds, where he had a carried interest. The defendants have pointed to contrary evidence that supports Pardun's independence, but assuming for the sake of analysis that Pardun could have felt some sense of obligation to Krausz and USVP such that a negative inference could be drawn for purposes of a motion for summary judgment, Pardun's lack of independence would not create a conflict. As previously explained, the interests of Krausz and USVP were aligned with those of the common stockholders. The fact that Pardun became a director of Calix following the Merger, standing alone, did not make him interested in the transaction. *See Orman,* 794 A.2d at 28–29.

As to Moyer, the plaintiffs observe only that he served with Pardun on the boards of MaxLinear and CalAmp Corp. and that Pardun was once a director of Western Digital Corp., where Moyer had been CFO. These connections are insufficient to give rise to a dispute of material fact about Moyer's disinterestedness and independence.

As the foregoing analysis shows, the plaintiffs have not called into question the disinterestedness and independence of a sufficient number of directors to cause the standard of review to intensify to entire fairness. Enhanced scrutiny remains the governing standard of review.

### 2. The Enhanced Scrutiny Analysis

■ Tailored to the M & A context, enhanced scrutiny requires that the defendant fiduciaries show that they "act[ed] reasonably to seek the transaction offering the best value reasonably available to the stockholders," which could be remaining independent and not engaging in any transaction at all. *Paramount Commc'ns*

was not disinterested or independent in this case.").

*Inc. v. QVC Network Inc.,* 637 A.2d 34, 43 (Del.1994). To meet this test, the defendants must demonstrate both (i) the reasonableness of "the decisionmaking process employed by the directors, including the information on which the directors based their decision," and (ii) "the reasonableness of the directors' action in light of the circumstances then existing." *Id.* at 45.

As these formulations demonstrate, the metric for measuring fiduciary duties under the enhanced scrutiny test is reasonableness. *In re Toys "R" Us, Inc. S'holder Litig.,* 877 A.2d 975, 1000 (Del.Ch. 2005) ("[In *Revlon,*] the Supreme Court held that courts would subject directors subject to *Revlon* ... to a heightened standard of reasonableness review, rather than the laxer standard of rationality review applicable under the business judgment rule."). As Chief Justice Strine explained while serving as a Vice Chancellor,

> [w]hat is important and different about the *Revlon* [enhanced scrutiny] standard is the intensity of judicial review that is applied to the directors' conduct. Unlike the bare rationality standard applicable to garden-variety decisions subject to the business judgment rule, the *Revlon* standard contemplates a judicial examination of the reasonableness of the board's decision-making process. Although linguistically not obvious, this reasonableness review is more searching than rationality review, and there is less tolerance for slack by the directors.

*In re Netsmart Techs., Inc. S'holder Litig.,* 924 A.2d 171, 192 (Del.Ch.2007) (footnote omitted); *accord Dollar Thrifty,* 14 A.3d at 598 (noting that when applying enhanced scrutiny, "the court seeks to assure itself that the board acted reasonably, in the sense of taking a logical and reasoned approach for the purpose of advancing a proper objective").

The objective reasonableness standard does not, however, permit a reviewing court to freely substitute its own judgment for the directors':

> There are many business and financial considerations implicated in investigating and selecting the best value reasonably available. The board of directors is the corporate decisionmaking body best equipped to make these judgments. Accordingly, a court applying enhanced judicial scrutiny should be deciding whether the directors made a reasonable decision, not a perfect decision. If a board selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the board's determination. Thus, courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness.

*QVC,* 637 A.2d at 45; *accord Dollar Thrifty,* 14 A.3d at 595–96 ("[A]t bottom *Revlon* is a test of reasonableness; directors are generally free to select the path to value maximization, so long as they choose a reasonable route to get there.").

The plaintiffs contend that the defendants' actions during the sale process fell outside the range of reasonableness, and they focus particularly on (i) the Board's ultimatum to Adtran to make an offer within 24–hours and (ii) the Board's reliance on Jefferies's 24–hour, July 4th holiday weekend "market check." In essence, the plaintiffs contend that the defendants acted unreasonably by favoring Calix and failing to develop or pursue other alternatives that could have generated higher value for the stockholders.

A board of directors may favor a bidder if "in good faith and advisedly it believes shareholder interests would be thereby advanced." *In re Fort Howard Corp. S'holders Litig.*, 1988 WL 83147, at *14 (Del.Ch. Aug. 8, 1988) (Allen, C.). "[A] board may not favor one bidder over another for selfish or inappropriate reasons." *Golden Cycle, LLC v. Allan*, 1998 WL 892631, at *14 (Del.Ch. Dec. 10, 1998). "[A]ny favoritism [directors] display toward particular bidders must be justified solely by reference to the objective of maximizing the price the stockholders receive for their shares." *In re Topps Co. S'holders Litig.*, 926 A.2d 58, 64 (Del.Ch.2007). A board "may tilt the playing field if, but only if, it is in the shareholders' interest to do so." *In re J.P. Stevens & Co. S'holders Litig.*, 542 A.2d 770, 782 (Del.Ch.1988). Consequently, the "paradigmatic context for a good *Revlon* claim … is when a supine board under the sway of an overweening CEO bent on a certain direction[ ] tilts the sales process for reasons inimical to the stockholders' desire for the best price." *Toys "R" Us*, 877 A.2d at 1002; *accord Topps Co.*, 926 A.2d at 64 ("When directors bias the process against one bidder and toward another not in a reasoned effort to maximize advantage for the stockholders, but to tilt the process toward the bidder more likely to continue current management, they commit a breach of fiduciary duty.").

When evaluated as a whole, the record supports a reasonable inference that the Board favored Calix at the expense of generating greater value through a competitive bidding process or by remaining a stand-alone company and pursuing acquisitions. This is not the only inference that can be drawn, nor even necessarily the strongest inference, but it is a reasonable inference to which the plaintiffs are entitled at this procedural stage.

Support for this inference comes from the contrast between Occam's interactions with Calix versus its interactions with Adtran. Krausz initiated contact with Calix, and he continued to interact regularly with Russo throughout the sale process. Krausz and Howard–Anderson responded promptly to inquiries by Calix, quickly signed a non-disclosure agreement, barely negotiated over Calix's term sheet, agreed to exclusivity, and passively extended the exclusivity on each of the three occasions when it expired. Occam acted much differently towards Adtran. In July 2009, Adtran's CFO called Howard–Anderson to discuss strategic alternatives, invited Howard–Anderson to visit Huntsville, and sent Occam a non-disclosure agreement. Occam did not execute the non-disclosure agreement until five months later, and Howard–Anderson did not visit Huntsville until December 2009. In February 2010, Occam's executives met with Adtran's executives, but the evidence supports an inference that Howard–Anderson and his team were not receptive to a transaction. Despite perceiving that Occam was not looking to sell, Adtran was considering an all-cash offer as early as late February 2010. There is also evidence that Adtran's CFO believed Adtran had reached a "common understanding on price" with Howard–Anderson. It is reasonable to infer at this stage of the proceeding that Adtran discussed valuation ranges with Occam that met Occam's pricing expectations.

During June 2010, Occam engaged in discussions with both Calix and Adtran. The discussions between Occam and Calix involved senior executives for both sides, including Howard–Anderson and Seeley. It was Jefferies who touched base with Adtran. Nevertheless, on June 24, Adtran sent a letter of intent proposing a range for an all-cash offer of $8.60 per share, a premium of approximately 11% over the Calix bid. When the Adtran and Calix

expressions of interest were described to the Board, they were portrayed as equivalent for illustrative purposes. Given this evidence, it is reasonable to infer that although Adtran was a serious suitor that was contemplating an all-cash deal at prices exceeding Calix's level of interest, Occam favored Calix over Adtran. The defendants have not identified stockholder-motivated reasons for doing so sufficient to justify their actions at the summary judgment stage.

Occam also did not vigorously pursue other logical bidders. As early as June 2009, Jefferies recommended that Occam commence a competitive process and began identifying potential candidates for a strategic partnership. While Occam met with some of these potential candidates in the second half of 2009, it did not aggressively pursue any of those opportunities. A June 2010 Jefferies presentation identifies ADC, Alcatel-Lucent, Cisco, Huawei, and Ericsson as additional first-tier candidates. Occam only reached out to those bidders through the July 4th market check.

The 24–hour July 4th market check fell outside the range of reasonableness. On July 1, 2010, the Thursday before the July 4th weekend, Jefferies sent emails to seven other potential buyers. None mentioned Occam by name. Each imposed a 24–hour deadline for a response. Five of the seven parties nevertheless got back to Jefferies and expressed interest, but stated that the time frame was too short for a meaningful response. Occam and Jefferies did not follow up with any of the potential bidders.

The evidence also supports a reasonable inference that it was unreasonable for Occam to give Adtran a 24–hour ultimatum to make a bid when there was no need for such a short deadline. Adtran's CFO de-scribed it as a "24 hour gun to our head." Not surprisingly, Adtran did not bid.

Viewed as a whole, the record supports an inference that it fell outside the range of reasonableness for the Board to rely on Jefferies's 24–hour, July 4th market check and, under the circumstances then existing, to deliver an ultimatum to Adtran to make an offer within 24 hours. It is worth stressing that there is competing evidence that supports the reasonableness of the Board's decisions, and the court has not made any finding adverse to the defendants. At this stage of the case, however, the court is not permitted to resolve evidentiary conflicts or choose among competing inferences. Rule 56 requires that the court resolve evidentiary conflicts in favor of the non-movant plaintiffs and grant the plaintiffs all reasonable inferences.

### 3. The Exculpatory Provision

Section 102(b)(7) of the DGCL authorizes Delaware corporations to include provisions in their certificate of incorporation exculpating directors from liability:

> [T]he certificate of incorporation may also contain . . . [a] provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit.

8 *Del. C.* § 102(b)(7). Occam's certificate of incorporation contained an Exculpatory Provision:

> No director of the Corporation shall be personally liable to the Corporation or any stockholder for monetary damages for breach of fiduciary duty as a director, except for any matter in respect of which such director shall be liable under Section 174 of the GCL or any amendment thereto or shall be liable by reason that, in addition to any and all other requirements for such liability, such director (1) shall have breached the director's duty of loyalty to the Corporation or its stockholders, (2) shall have acted in manner not in good faith or involving intentional misconduct or a, knowing violation of law or, in failing to act, shall have acted in a manner involving intentional misconduct or a knowing violation of law, or (3) shall have derived an improper personal benefit. If the GCL is hereafter amended to authorize the further elimination or limitation of the liability of a director, the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the GCL, as so amended.

Defs.' Mot. Ex. 100, art. VIII.

■ An exculpatory provision shields the directors from personal liability for monetary damages for a breach of fiduciary duty, except liability for the four categories listed in Section 102(b)(7). "The totality of these limitations or exceptions . . . is to . . . eliminate . . . director liability only for 'duty of care' violations. With respect to other culpable directorial actions, the conventional liability of directors for wrongful conduct remains intact." 1 David A. Drexler et al., *Delaware Corporation Law and Practice*, § 6.02[7] at 6–18 (2013). An exculpatory provision therefore "will not place challenged conduct beyond judicial review." *Id.* at 6–19.

■ For an exculpatory provision to apply, the court must find that "the factual basis for [the] claim *solely* implicates a violation of the duty of care." *Emerald P'rs v. Berlin (Emerald I)*, 726 A.2d 1215, 1224 (Del.1999); *accord Emerald P'rs v. Berlin (Emerald II)*, 787 A.2d 85, 98 (Del. 2001) (holding that defendant directors can obtain exculpation only if they prove that their breach of duty was "exclusively attributable to a violation of the duty of care"). In a case where the standard of review places the burden of proof on the defendant fiduciaries, the burden of making this showing "falls upon the director." *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *40 (Del.Ch. June 4, 2004); *accord Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1164 (Del.Ch.2006).

■ Depending on the facts of the case, the standard of review, and the procedural stage of the litigation, a court may be able to determine that a plaintiff's claims only involve breaches of the duty of care such that the court can apply an exculpatory provision to enter judgment in favor of the defendant directors before making a post-trial finding of a breach of fiduciary duty and determining the nature of the breach.[13] If a court cannot make

---

13. *See generally* Drexler et al., *supra,* § 6.02[7] at 6–21. For decisions illustrating how the Section 102(b)(7) analysis may proceed differently depending on the facts alleged, the standard of review, and the procedural stage, compare *Emerald I*, 726 A.2d at 1223 (holding that in challenge to transaction with majority stockholder to which entire fairness applied, court could not apply Section 102(b)(7) on motion for summary judgment because factual conflicts required a trial to determine nature of the duty breached), with *Malpiede v. Townson*, 780 A.2d 1075, 1094–96 (Del.2001) (holding that in challenge to third-party, arm's-length merger that was approved by fully informed stockholder vote,

the requisite determination as a matter of law on a pre-trial record, then it becomes necessary to hold a trial and evaluate each director's potential liability individually. "The liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director." *Emerging Commc'ns*, 2004 WL 1305745, at *38; *accord Venhill Ltd. P'ship ex rel. Stallkamp v. Hillman*, 2008 WL 2270488, at *23 (Del.Ch. June 3, 2008).

### a. The Director Defendants' Good Faith

Despite agreeing for purposes of the motion for summary judgment that enhanced scrutiny provides the operative standard of review, the director defendants briefed the application of the Exculpatory Provision to the sale process as if the case were governed by the business judgment rule. They framed the loyalty inquiry in terms of whether the directors were nominally disinterested and independent, and they addressed only one means by which a director could fail to act in good faith: by "knowingly and completely fail[ing] to undertake their responsibilities." Defs.' Mot. Br. at 29 (quoting *Lyon-*

court could apply Section 102(b)(7) at pleadings stage unless plaintiff pled facts sufficient to show that a majority of the board was not disinterested or independent), with *Emerald II*, 787 A.2d at 93–94 (holding that in challenge to transaction with majority stockholder to which entire fairness applied, court could not apply Section 102(b)(7) post trial without first analyzing transaction under entire fairness standard to determine nature of the fiduciary breach), with *Lyondell*, 970 A.2d at 237, 244 (holding that in challenge to third-party, arm's-length merger, court could apply Section 102(b)(7) at summary judgment stage where plaintiffs/appellees claimed that directors "consciously disregarded their fiduciary duties" yet evidence showed that directors had not "utterly failed to attempt to obtain the best sale price").

*dell*, 970 A.2d at 243–44). The operative standard of review for this case, however, is enhanced scrutiny, an intermediate standard that applies in situations where "there is a basis for concern that directors without a pure self-dealing motive might be influenced by considerations other than the best interests of the corporation and other stockholders." *Dollar Thrifty*, 14 A.3d at 599 n. 181. The loyalty issue in this case is whether the directors allowed interests other than obtaining the best value reasonably available for Occam's stockholders to influence their decisions during the sale process, given that they made decisions falling outside of the range of reasonableness.

### b. The Loyalty–Based Underpinnings Of Enhanced Scrutiny

 Claims that are subject to enhanced scrutiny "do not admit of easy categorization as duties of care or loyalty." *Santa Fe*, 669 A.2d at 67. "Enhanced scrutiny applies to specific, recurring, and readily identifiable situations involving potential conflicts of interest where the realities of the decisionmaking context can subtly undermine the decisions of even independent and disinterested directors." [14]

14. *Trados II*, 73 A.3d at 43; *accord Reis*, 28 A.3d at 457–59; *see QVC*, 637 A.2d at 42 & n. 9 (contrasting those "rare situations which mandate that a court ... subject[] the directors' conduct to enhanced scrutiny" with situations where "[a]ctual self-interest is present and affects a majority of the directors," to which entire fairness applies); *In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 439 (Del. Ch.2012) (explaining that enhanced scrutiny applies to mergers because "the potential sale of a corporation has enormous implications for corporate managers and advisors, and a range of human motivations, including but by no means limited to greed, can inspire fiduciaries and their advisors to be less than faithful"); *Dollar Thrifty*, 14 A.3d at 599 n. 181 (explaining that enhanced scrutiny applies to situations where "there is a basis for concern

In those contexts, "the predicate question of what the board's true motivation was comes into play," and "[t]he court must take a nuanced and realistic look at the possibility that personal interests short of pure self-dealing have influenced the board." *Dollar Thrifty*, 14 A.3d at 598.

The Delaware Supreme Court created the intermediate standard of review in its iconic *Unocal* decision, which declined to apply either the business judgment rule or the entire fairness test to actions taken by directors to resist a hostile takeover.[15] The Delaware Supreme Court recognized that in such a setting, there is an "omnipresent specter" that even nominally disinterested and independent directors may be influenced by and act to further their own interests or those of incumbent management, "rather than those of the corporation and its shareholders." *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del.1985). To address this subtle conflict, the Delaware Supreme Court held that the target directors would have the burden of showing that (i) "they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed" and (ii) the response they selected was "reasonable in relation to the threat posed." *Id.* at 955.

One year later, in *Revlon*, the Delaware Supreme Court held that its then-new intermediate standard would apply to the sale of a corporation for cash. *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 180–82 (Del.1986). Just as the *Unocal* decision focused on the potential conflicts created by a hostile bid, the *Revlon* case focused on the potential conflicts created by a sale. As Chief Justice Strine explained while serving as Chancellor, "the potential sale of a corporation has enormous implications for corporate managers and advisors, and a range of human motivations, including but by no means limited to greed, can inspire fiduciaries and their advisors to be less than faithful." *El Paso*, 41 A.3d at 439.

The heightened scrutiny that applies in the *Revlon* (and *Unocal*) contexts are, in large measure, rooted in a concern that the board might harbor personal motivations in the sale context that differ from what is best for the corporation and its stockholders. Most traditionally, there is the danger that top corporate managers will resist a sale that might cost them their managerial posts, or prefer a sale to one industry rival rather than another for reasons having more to do with personal ego than with what is best for stockholders.[16]

that directors without a pure self-dealing motive might be influenced by considerations other than the best interests of the corporation and other stockholders").

**15.** *See Dollar Thrifty*, 14 A.3d at 597 ("Avoiding a crude bifurcation of the world into two starkly divergent categories—business judgment rule review reflecting a policy of maximal deference to disinterested board decision-making and entire fairness review reflecting a policy of extreme skepticism toward self-dealing decisions—the Delaware Supreme Court's *Unocal* and *Revlon* decisions adopted a middle ground."); *Golden Cycle*, 1998 WL 892631, at *11 (locating enhanced scrutiny under *Unocal* and *Revlon* between the business judgment rule and the entire fairness

test); Stephen M. Bainbridge, Unocal *at 20: Director Primacy in Corporate Takeovers*, 31 Del. J. Corp. L. 769, 795–96 (2006) (explaining Delaware Supreme Court's decision to create an intermediate standard of review between the entire fairness and business judgment rule standards); Ronald J. Gilson, Unocal *Fifteen Years Later (And What We Can Do About It )*, 26 Del. J. Corp. L. 491, 496 (2001) ("In *Unocal*, the Delaware Supreme Court chose the middle ground that had been championed by no one. The court unveiled an intermediate standard of review....").

**16.** *Dollar Thrifty*, 14 A.3d at 597 (footnote omitted); *see J.P. Stevens*, 542 A.2d at 781 (arguing that *Revlon* is best viewed as a duty of loyalty case); *Fort Howard*, 1988 WL

These conflicts of interest arise because "[a] negotiated corporate acquisition is a paradigmatic example of a final period problem."[17] Delaware decisions have recognized that the standard of review changes to enhanced scrutiny for decisions made during the final period.[18] Although Delaware law does not embrace "the notion that persons suffering from conflicts are invariably incapable of putting them aside," it also does not "ignore the reality that American business history is littered with examples of managers who exploited the opportunity to work both sides of a deal." *In re Lear Corp. S'holder Litig.,* 926 A.2d 94, 117 (Del.Ch.2007).

The metric of reasonableness employed in the intermediate standard of review enables a reviewing court to "smoke out mere pretextual justifications for improperly motivated decisions." *Dollar Thrifty,* 14 A.3d at 598–99.

Conceived in that way, [enhanced scrutiny] is itself reminiscent of some federal Constitutional standards of review, which smoke out the actual objective supposedly motivating challenged governmental action and require a fit (of looser or tighter nature) between that objective and the means used. This approach to analyzing behavior also is use-

---

83147, at *14 (describing *Revlon* as "essentially a breach of loyalty case in which the board was not seen as acting in the good faith pursuit of the shareholders' interests").

17. Bainbridge, *supra,* at 788–89; *accord* Bernard Black & Reinier Kraakman, *Delaware's Takeover Law: The Uncertain Search for Hidden Value,* 96 Nw. U.L.Rev. 521, 536 (2002) (describing negotiated acquisition as a scenario in which "the target's managers and board will likely lose their positions. They face a strong conflict of interest, yet they are in a final period where reputation and fear of future discipline lose their force as constraints on self-interested behavior."); Ronald J. Gilson & Reinier Kraakman, *What Triggers* Revlon?, 25 Wake Forest L.Rev. 37, 54 (1990) ("A friendly merger in which the ownership of a constituent company remains diffuse but de facto control shifts from one management team to another, is no less a control shift than a transaction that gives rise to a control block.... [T]he absence of [a controller] ... does not reduce the danger that [stockholder] interests will suffer under the merger terms negotiated by their own management."); Sean J. Griffith, *The Costs and Benefits of Precommitment: An Appraisal of Omnicare v. NCS Healthcare,* 29 J. Corp. L. 569, 616 (2004) ("Acquisitions create a last period scenario for target managers and directors because the reorganization of the corporate structure following the transaction is likely either to end their tenure or, at the very least, significantly change their role in the company."); Sean J. Griffith, *Deal Protection Provisions in the Last Period of Play,* 71 Fordham

L.Rev. 1899, 1945 (2003) ("Although the drama and hyperbole of a bust up acquisition is typically not present in the context of a 'friendly' merger—after all, the business continues to operate and many employees keep their jobs—last period features are still present at the level of the board of directors and senior management, many of whom are likely to be in the last period of their employment."). *See generally Standard of Review, supra,* at 8–18 (discussing final period problem and implications of situational conflicts for *Revlon* as a standard of review).

18. *See McMullin,* 765 A.2d at 918 (applying enhanced scrutiny where the board's decision constituted "a final-stage transaction for all shareholders"); *Lonergan v. EPE Hldgs. LLC,* 5 A.3d 1008, 1019 (Del.Ch.2010) ("In a final stage transaction—be it a cash sale, a breakup, or a transaction like a change of control that fundamentally alters ownership rights—there are sufficient dangers to merit employing enhanced scrutiny...."); *In re Pennaco Energy, Inc. S'holders Litig.,* 787 A.2d 691, 704 (Del.Ch.2001) (applying enhanced scrutiny to "an end-game transaction that represents the final opportunity for Pennaco's stockholders to realize value from their investment in the company"); *Mendel v. Carroll,* 651 A.2d 297, 306 (Del.Ch.1994) (Allen, C.) ("[I]f the board were to approve a proposed cash-out merger, it would have to bear in mind that the transaction is a final-stage transaction for the public shareholders. Thus, the time frame for analysis, insofar as those shareholders are concerned, is immediate value maximization.").

ful in exposing pre-textual justifications. Because there is a burden on the party in power to identify its legitimate objectives and to explain its actions as necessary to advance those objections, flimsy pretense stands a greater chance of being revealed.

*Mercier v. Inter–Tel (Del.), Inc.,* 929 A.2d 786, 807 (Del.Ch.2007) (footnotes omitted); *see, e.g., Phillips v. Insituform of N. Am., Inc.,* 1987 WL 16285, at *5–6, *11 (Del.Ch. Aug. 27, 1987) (Allen, C.) (applying enhanced scrutiny, finding that a board's proffered justifications for its actions were a pretext, and holding that the plaintiffs had demonstrated a likelihood of success in showing that the board breached its fiduciary duties). "[T]he reasonableness standard requires the court to consider for itself whether the board is truly well motivated (i.e., is it acting for the proper ends?) before ultimately determining whether its means were themselves a reasonable way of advancing those ends." *Dollar Thrifty,* 14 A.3d at 599–600.

### c. *Lyondell*

Because this is a case where enhanced scrutiny applies, and because the directors took actions that fell outside the range of reasonableness, the plaintiffs contend that this court can draw an inference of bad faith. The director defendants vehemently reject this view, arguing that under the Delaware Supreme Court's decision in *Lyondell,* summary judgment must be granted in their favor unless the plaintiffs can show that the directors "utterly failed to attempt to obtain the best sale price." 970 A.2d at 244. The *Lyondell* decision of course would be dispositive to the extent the plaintiffs in this case made the same legal argument that the *Lyondell* plaintiffs made, namely that the directors consciously disregarded known obligations imposed by *Revlon. See In re MFW S'holders Litig.,* 67 A.3d 496, 520 (Del.Ch.2013)

("There is no question that, if the Supreme Court has clearly spoken on a question of law necessary to deciding a case before it, this court must follow its answer."), *aff'd sub nom. Kahn v. M & F Worldwide Corp.,* 2014 WL 996270 (Del. Mar. 14, 2014). But the plaintiffs here have made a different argument. They say that certain directors had interests that diverged from those of the common stockholders, that other directors faced the types of situational conflicts inherent in an enhanced scrutiny setting, and that there is evidence that the directors gave into those conflicts by steering Occam into a deal with Calix through a course of actions falling outside the range of reasonableness. Based on this combination, they argue that the court can draw the inference that the directors acted for reasons unrelated to the pursuit of the highest value reasonably available. *Lyondell* does not speak to this theory.

In *Lyondell,* the Delaware Supreme Court relied on a Section 102(b)(7) provision to grant summary judgment in favor of the defendant directors against breach of fiduciary duty challenges to a transaction governed by enhanced scrutiny. 970 A.2d at 244. The plaintiffs argued to the Court of Chancery that Section 102(b)(7) did not apply because the defendant directors failed to act "in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities." *Ryan v. Lyondell Chem. Co.,* 2008 WL 2923427, at *19 (Del.Ch. July 29, 2008) (quoting *Stone ex rel. AmSouth Bancorporation v. Ritter,* 911 A.2d 362, 370 (Del. 2006)), *rev'd,* 970 A.2d 235 (Del.2009). The *Lyondell* plaintiffs thus "attempted to apply the *Caremark* standard for lack of good faith to the context of a control transaction." *La. Mun. Police Emps.' Ret. Sys. v. Fertitta,* 2009 WL 2263406, at *8 (Del. Ch. July 28, 2009) (footnote omitted).

At the trial court level, the plaintiffs argued successfully that *Revlon* and its progeny established a known set of duties that required certain conduct by the directors when faced with a merger proposal. *Ryan*, 2008 WL 2923427, at *19. Given that premise, the trial court agreed that the evidence supported an inference that the directors consciously disregarded those known duties by not taking any of the steps that *Revlon* ostensibly required:

> The record, as it presently stands, does not, as a matter of undisputed material fact, demonstrate the Lyondell directors' good faith discharge of their *Revlon* duties—a known set of "duties" requiring certain conduct or impeccable knowledge of the market in the face of Basell's offer to acquire the Company. Perhaps with a more fully developed record or after trial, the Court will be satisfied that the Board's efforts were done with sufficient good faith to absolve the directors of liability for money damages for any potential procedural shortcomings. With a record that does not clearly show the Board's good faith discharge of its *Revlon* duties, however, whether the members of the Board are entitled to seek shelter under the Company's exculpatory charter provision for procedural shortcomings amounting to a violation of their known fiduciary obligations in a sale scenario presents a question of fact that cannot now be resolved on summary judgment.

*Id.* The trial court therefore denied the motion for summary judgment based on the exculpatory provision. *Id.*

The *Lyondell* plaintiffs' argument about a "known set of duties" and "known fiduciary obligations in a sale scenario" reprised an early misunderstanding of *Revlon*. As Chancellor Allen explained in the *Equity–Linked* decision,

> One view of the holding in *Revlon* was that it was premised on a duty ... that was different in some way from the ordinary director duties.... On this view, once a "sale" of the corporation was in contemplation, "*Revlon* duties" would be thought to limit the range of good faith business judgment that the board might make (e.g., board must conduct an auction; or no "lock-up" agreements allowed; or no "favoritism" among bidders; etc.), and afforded a reviewing court additional (fairness) grounds in any judicial review of director action. This interpretation of "*Revlon* duties" was early on taken up by academic commentators and plaintiffs' attorneys and continued to resonate in some of the opinions throughout the period.

*Equity–Linked Investors, L.P. v. Adams*, 705 A.2d 1040, 1054 (Del.Ch.1997). The *Lyondell* plaintiffs took this view one step further by arguing not only that *Revlon* established specific conduct obligations for directors, but also that directors acted in bad faith if they consciously disregarded those known obligations.

The Delaware Supreme Court, however, had repeatedly rejected this view of *Revlon*.[19] Summarizing those decisions, then-

---

19. *See Malpiede*, 780 A.2d at 1083 ("In our view, *Revlon* neither creates a new type of fiduciary duty in the sale-of-control context nor alters the nature of the fiduciary duties that generally apply."); *QVC*, 637 A.2d at 43 ("The directors' fiduciary duties in a sale of control context are those which generally attach. In short, 'the directors must act in accordance with their fundamental duties of care and loyalty.' "); *Barkan*, 567 A.2d at 1286 ("[T]he basic teaching of [*Revlon* and *Unocal* ] is simply that the directors must act in accordance with their fundamental duties of care and loyalty."); *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1288 (Del.1989) ("Beyond [seeking the alternative offering the best value reasonably available for stockhold-

Vice Chancellor Strine explained that *Revlon* does not establish a specific set of conduct obligations: "As is well known, *Revlon* does not require that a board, in determining the value-maximizing transaction, follow any specific plan or roadmap in meeting its duty to take reasonable steps to secure—i.e., actually attain—the best immediate value." [20] Instead, *Revlon* is a standard of review in which "the reviewing court has leeway to examine the reasonableness of the board's actions under a standard that is more stringent than business judgment review and yet less severe than the entire fairness standard." *Dollar Thrifty*, 14 A.3d at 598.

On appeal in *Lyondell*, and consistent with these precedents, the Delaware Supreme Court decisively rejected the contention that *Revlon* imposed specific conduct obligations, knowable by and known to directors, such that a board would act in bad faith by consciously disregarding them. The high court held that the Court of Chancery erred by reading "*Revlon* and its progeny as creating a set of requirements that must be satisfied during the sale process." *Lyondell*, 970 A.2d at 241. In reversing the trial court, the Delaware Supreme Court held to the contrary: "No court can tell directors exactly how to accomplish [the goal of obtaining the best value reasonably available] because they will be facing a unique combination of circumstances, many of which will be outside their control." *Id.* at 242.

■ The Delaware Supreme Court then restated the theory of bad faith at issue in the case, namely that "bad faith

will be found if a 'fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.'" *Id.* (quoting *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del.2006)). The Delaware Supreme Court ruled out this theory because the necessary predicate—known duties—did not exist:

> The trial court decided that the *Revlon* sale process must follow one of three courses, and that the Lyondell directors did not discharge that "known set of [*Revlon*] 'duties'." But, as noted, there are no legally prescribed steps that directors must follow to satisfy their *Revlon* duties. Thus, the directors' failure to take any specific steps during the sale process could not have demonstrated a conscious disregard of their duties.

*Id.* at 243 (footnote omitted). The Delaware Supreme Court also addressed what it would mean for directors to "consciously disregard" a known duty, assuming one existed. The Delaware Supreme Court stated:

> Only if they knowingly and completely failed to undertake their responsibilities would they breach their duty of loyalty. The trial court approached the record from the wrong perspective. Instead of questioning whether disinterested, independent directors did everything that they (arguably) should have done to obtain the best sale price, the inquiry should have been whether those directors utterly failed to attempt to obtain the best sale price.

---

ers], there are no special and distinct '*Revlon* duties.' ").

**20.** *Dollar Thrifty*, 14 A.3d at 595; *accord Barkan*, 567 A.2d at 1286 ("[T]here is no single blueprint that a board must follow to fulfill its duties. A stereotypical approach to the sale and acquisition of corporate control is not to

be expected in the face of the evolving techniques and financing devices employed in today's corporate environment."); *Netsmart*, 924 A.2d at 192 ("This duty—often called a *Revlon* duty . . .—does not, of course, require every board to follow a judicially prescribed checklist of sales activities.").

*Id.* at 243–44. The "utterly failed to attempt" standard is the logical contrapositive of "consciously disregard[ing] known duties." As long as a board attempts to meet its duties, no matter how incompetently, the directors did not consciously disregard their obligations.

In this case, the defendants seek to apply the "utterly failed to attempt" language broadly as if it established a new standard that supplanted all the other means by which a plaintiff can attempt to show bad faith. The *Lyondell* decision, however, only addressed the theory of consciously disregarding known duties, which was the premise that the plaintiffs advanced and that the trial court accepted. The *Lyondell* court recognized that there were other theories of bad faith. Quoting at length from its decision in *Disney*, the Delaware Supreme Court in *Lyondell* court described the concept of bad faith as follows:

> [A]t least three different categories of fiduciary behavior are candidates for the "bad faith" pejorative label. The first category involves so-called "subjective bad faith," that is, fiduciary conduct motivated by an actual intent to do harm.... [S]uch conduct constitutes classic, quintessential bad faith....
>
> The second category of conduct, which is at the opposite end of the spectrum, involves lack of due care—that is, fiduciary action taken solely by reason of gross negligence and without any malevolent intent.... [W]e address the issue of whether gross negligence (including failure to inform one's self of available material facts), without more, can also constitute bad faith. The answer is clearly no.
>
> \* \* \*
>
> That leaves the third category of fiduciary conduct, which falls in between the first two categories.... This third cate-

gory is what the Chancellor's definition of bad faith—intentional dereliction of duty, a conscious disregard for one's responsibilities—is intended to capture. The question is whether such misconduct is properly treated as a non-exculpable, nonindemnifiable violation of the fiduciary duty to act in good faith. In our view, it must be.

*Lyondell*, 970 A.2d at 240 (quoting *Disney*, 906 A.2d at 64–66). The *Lyondell* court stressed that "[t]he *Disney* decision expressly disavowed any attempt to provide a comprehensive or exclusive definition of 'bad faith.'" *Id.* This aspect of the *Lyondell* decision precludes any suggestion that the Delaware Supreme Court thought that the conscious disregard of known duties was the only type of bad faith.

The source of the "utter failure to attempt" likewise reflects the Delaware Supreme Court's focus on the "conscious disregard" strand of bad faith. The *Lyondell* decision reveals that the high court drew this standard from *Stone* and *Caremark*, which address what a plaintiff must plead and later prove to show that directors failed to act in good faith by exercising oversight of the corporation's compliance with its legal and regulatory obligations. *Id.* Citing *Stone*'s adoption of the *Caremark* test, the *Lyondell* court stated:

> [W]here a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation ... only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability.

*Id.* (quoting *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 971 (Del.Ch. 1996)). This passage indicates that the *Lyondell* court used the "utter failure to

attempt" standard because it was dealing with allegations that directors had consciously disregarded known duties, as in the *Caremark* context.

In this case, the plaintiffs do not contend that the Occam directors consciously disregarded known duties. They instead invoke a different line of Delaware precedent, which holds that "[a] failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation."[21] "[A] range of human motivations ... can inspire fiduciaries and their advisors to be less than faithful to their contextual duty to pursue the best value for the company's stockholders." *El Paso*, 41 A.3d at 439. "Greed is not the only human emotion that can pull one from the path of propriety; so might hatred, lust, envy, revenge, ... shame or pride. Indeed any human emotion may cause a director to place his own interests, preferences or appetites before the welfare of the corporation." *RJR Nabisco*, 1989 WL 7036, at *15.

The "utterly failed to attempt" standard does not govern the question of whether the evidence supports a permissible inference that the directors acted with a purpose other than that of advancing the best interests of the corporation. *See Fertitta*, 2009 WL 2263406, at *8. Nor would such a standard fit well with Delaware's established standards of review. "'Utterly failed' is a linguistically extreme formulation." Bradley R. Aronstam & David E. Ross, *Retracing Delaware's Corporate Roots Through Recent Decisions: Corporate Foundations Remain Stable While Judicial Standards of Review Continue to Evolve*, 12 Del. L.Rev. 1, 13 n.73 (2010).

Imagine a field goal kicker who misses wide right. He failed, but did he "utterly fail"? Certainly not: he tried and missed. But at what point does the failure become "utter"? If his foot missed the ball? He still would have attempted the kick, and thus would not have "knowingly and completely failed to undertake [his] responsibilities." What if he picks up the ball, tries to run and fumbles, or tries to pass and throws an interception? In both instances he has failed to attempt a kick, his core responsibility, but he did try to do something. If an attempt is all that matters, as the "utter failure" test suggestions, then one can well wonder how a board ever could "utterly fail" in the change of control setting.

*Id.* Yet under the business judgment rule, Delaware's most director-friendly test, a plaintiff can plead (and later prove) bad faith by showing that a decision lacked any rationally conceivable basis, which permits a court to infer an improper motive and a breach of the duty of loyalty.[22] In those

---

**21.** *Disney*, 906 A.2d at 67; *accord Stone*, 911 A.2d at 369 ("A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation...."); *see In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del.Ch. Jan. 31, 1989) (Allen, C.) (explaining that the business judgment rule would not protect "a fiduciary who could be shown to have caused a transaction to be effectuated (even one in which he had no financial interest) for a reason unrelated to a pursuit of the corporation's best interests").

**22.** *See Realigning the Standard, supra*, at 452 (defining an irrational decision as "one that is so blatantly imprudent that it is inexplicable, in the sense that no well-motivated and minimally informed person could have made it"); *see also Brehm*, 746 A.2d at 264 ("Irrationality is the outer limit of the business judgment rule. Irrationality may be the functional equivalent of the waste test or it may tend to show that the decision is not made in good faith, which is a key ingredient of the business judgment rule." (footnote omitted)); *J.P. Stevens*, 542 A.2d at 780–81 ("A court may, however, review the substance of a business deci-

circumstances, the directors have made an attempt, yet under egregious circumstances a court could infer bad faith. If the "utterly failed to attempt" standard were read to apply more broadly than the issue of "conscious disregard" that was before the high court in the *Lyondell* case, then the test for a transaction implicating enhanced scrutiny would be more lenient than the business judgment standard. At least to my mind, that would get things backward.

■ The defendants therefore cannot obtain summary judgment in their favor simply by observing that they did not utterly fail to attempt to fulfill their fiduciary duties. The plaintiffs can defeat summary judgment by citing evidence which, when evaluated under the Rule 56 standard, supports an inference that the directors made decisions that fell outside the range of reasonableness for reasons other than pursuit of the best value reasonably available, which could be no transaction at all.

### d. Insufficient Evidence Of Improper Motive

■ The factual record does not contain evidence sufficient to create a dispute of material fact about the outside directors' good faith pursuit of the best value reasonably available. Although they made decisions which, for purposes of summary judgment, can be regarded as falling outside the range of reasonableness, the factual record will not support a reasonable inference that any of the outside directors were motivated by a non-stockholder-related influence. Krausz, Abbott, Pardun, Moyer, Bylin, and Strom have demonstrated that they exclusively breached their duty of care, and the Exculpatory Provision made by an *apparently* well motivated board for the limited purpose of assessing whether that decision is so far beyond the

sion bars any monetary damages award for such a breach.

This decision already has discussed the fact that all of the directors other than Howard–Anderson were disinterested and independent. For enhanced scrutiny, however, that fact alone is not dispositive, because "[t]he court must take a nuanced and realistic look at the possibility that personal interests short of pure self-dealing have influenced the board." *Dollar Thrifty*, 14 A.3d at 598. At the summary judgment stage, speculation about motives is not enough. "[A] plaintiff's inability to explain a Board's motivation to act in bad faith may ... be relevant in analyzing bad faith claims." *Answers II*, 2014 WL 463163, at *10.

Applying these standards, the evidence does not support a reasonable inference that the disinterested and independent directors acted for an improper motive. The strongest evidence of some type of personal interest comes from Krausz's focus on Russo throughout the sale process, his sharing of information with Russo about internal Occam boardroom dynamics, and Russo's understanding that Krausz and Abbott wanted "to ride a different stock." Pls.' Opp'n Ex. 33 at CALIX001269. For obvious reasons, the inference that Krausz provided confidential information about Occam boardroom dynamics to the CEO of a competitor and potential acquirer presents one of the more troubling aspects of the case.

Nevertheless, after discovery, the evidence about Krausz's behavior does not support any inference other than an effort to achieve a transaction that he believed would maximize the value of his funds' holdings, thereby maximizing value for all common stockholders. One can reasonbounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.").

ably infer that Krausz had confidence in Russo as an operator given the outsized success that he had achieved for Abbott in a prior investment. One can reasonably infer that Krausz thought Russo could pay the most and liked the eventual transaction structure where the stock component gave him some upside. One cannot reasonably infer that either Krausz or Abbott acted against their economic interests. The plaintiffs have not been able to offer any plausible theory as to why they would.

The plaintiffs also have not cited any evidence that would call into question the motives of Pardun, Moyer, Bylin, or Strom, other than Pardun's ostensible affiliation with Krausz and their participation in the Board's decision-making process. Because the evidence does not support a reasonable inference that Krausz acted for an improper purpose, the purported affiliation with Krausz does not taint Pardun. As for the Board's decision making, although for purposes of summary judgment this decision has drawn the inference that certain decisions could be found at trial to fall outside the range of reasonableness, it is not possible to infer that the directors acted for any improper purpose. Here again, the plaintiffs have not been able to offer any plausible non-stockholder-directed motive. Assuming their decisions ultimately were found at trial to fall outside the range of reasonableness, the director defendants would be entitled to exculpation. Summary judgment is therefore entered in their favor on the sale process claim.

◼◼◼ This analysis has focused on the outside directors. As previously noted, Howard–Anderson was interested in the Merger in the traditional sense because he personally received financial benefits from the Merger that were not shared with the stockholders. The Exculpatory Provision does not protect him.

### 4. The Officer Defendants

Howard–Anderson played a role in the sale process not only as a director, but also as the Company's CEO. Seeley was not a director. She served only in an officer capacity as the Company's CFO. Section 102(b)(7) does not authorize exculpation for officers. 8 *Del. C.* § 102(b)(7) (authorizing "a provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director"); *Gantler*, 965 A.2d at 709 n. 37 ("Although legislatively possible, there currently is no statutory provision authorizing comparable exculpation of corporate officers."). Because the plaintiffs have assembled evidence sufficient to support claims against Howard–Anderson and Seeley in their capacity as officers, the Exculpatory Provision does not protect them.

In *Gantler*, the Delaware Supreme Court held that plaintiffs had stated claims for breach of the duty of loyalty against two senior officers of First Niles Financial, Inc.: Stephens, the CEO who was also a director, and Safarek, the Vice President and Treasurer. 965 A.2d at 709. The complaint alleged that after the board of directors of First Niles decided to explore strategic alternatives, the officers breached their duty of loyalty by manipulating the process to sabotage the alternatives they did not personally favor, including by delaying the provision of due diligence information to potential bidders. *Id.* As to Stephens, the Supreme Court held that "[t]he alleged facts that make it reasonable to infer that Stephens violated his duty of loyalty as a director, also establish his violation of that same duty as an officer." *Id.* At to Safarek, who was solely an officer, the Supreme Court held that the complaint both stated a claim against Safarek for breach of duty as an officer and for

aiding and abetting Stephens' breach of loyalty as a director. *Id.*

Here, as in *Gantler*, the plaintiffs have cited evidence regarding actions that Howard–Anderson and Seeley took as officers that could support a reasonable inference of favoritism towards Calix consistent with their personal financial interests rather than the pursuit of maximal value for the stockholders. These actions include Howard–Anderson's delayed follow-up with Adtran in 2009 and their joint participation in due diligence presentations with Adtran during which the Occam representatives appear to have given Adtran the impression that Occam was not interested in a transaction. By contrast, Howard–Anderson responded quickly and supportively to Calix, an acquirer that was willing to confirm that it would honor management's change in control agreements and monetize all equity awards. At trial, the court will be able to weigh the evidence and determine what inferences to draw. At this stage, the non-movant plaintiffs are entitled to have inferences drawn in their favor.

The Exculpatory Provision does not protect Seeley because she only acted as an officer. Likewise, the Exculpatory Provision does not protect Howard–Anderson when acting in his officer capacity. *See Arnold*, 650 A.2d at 1288. Summary judgment based on the Exculpatory Provision is not available to these defendants.

## B. The Disclosure Claim

The defendants seek a determination as a matter of law that the disclosures in the Proxy Statement were accurate and the allegedly omitted information was either disclosed or immaterial. Summary judgment on this claim is denied.

█ When directors submit to the stockholders a transaction that requires stockholder approval, such as a merger,

"[t]he directors of a Delaware corporation are required to disclose fully and fairly all material information within the board's control." *Malone v. Brincat*, 722 A.2d 5, 12 (Del.1998). A fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del.1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). The inquiry does not require "a substantial likelihood that [the] disclosure ... would have caused the reasonable investor to change his vote." *Id.* (same). Rather, the question is whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* (same). "Whether disclosures are adequate is a mixed question of law and fact." *Zirn v. VLI Corp.*, 621 A.2d 773, 777 (Del. 1993).

### 1. Whether The 2012 Projections Were Reliable

█ The plaintiffs contend that the defendants should have disclosed revenue projections for 2012 in the Proxy Statement. The defendants argue that the 2012 projections were immaterial because they were unreliable and speculative, making it unnecessary to disclose them in the Proxy Statement.

█ "In the context of a cash-out merger, reliable management projections of the company's future prospects are of obvious materiality to the electorate." *PNB Hldg.*, 2006 WL 2403999, at *15. "After all, the key issue for the stockholders is whether accepting the merger price is a good deal in comparison with remaining a shareholder and receiving the future

expected returns of the company." *Id.* Writing as a Vice Chancellor, Chief Justice Strine elaborated on when projections must be disclosed:

> [P]rojections . . . fall into the category of documents that courts have referred to as "soft information," and the standard by which to determine whether or not soft information, such as pro formas and projections, must be disclosed has troubled courts and commentators. Projections of future performance are the kind of soft information that necessarily bespeaks caution, but they are also useful, particularly in the context of a cash-out merger. Even in the cash-out merger context, though, it is not our law that every extant estimate of a company's future results, however stale or however prepared, is material. Rather, because of their essentially predictive nature, our law has refused to deem projections material unless the circumstances of their preparation support the conclusion that they are reliable enough to aid the stockholders in making an informed judgment.

*Id.* at *16 (footnotes omitted). "The word reliable is critical." *Id.* "Delaware law does not require disclosure of inherently unreliable or speculative information which would tend to confuse stockholders or inundate them with an overload of information." *Arnold,* 650 A.2d at 1280; *accord In re Micromet, Inc. S'holders Litig.,* 2012 WL 681785, at *13 (Del.Ch. Feb. 29, 2012) (finding that projections were not required to be disclosed since they were not relied upon in the fairness opinion and "were intended by management solely as an internal tool"). "When management projections are made in the ordinary course of business, they are generally deemed reliable." *Cede & Co. v. Technicolor, Inc.,* 2003 WL 23700218, at *7 (Del.Ch. July 9, 2004), *aff'd in part, rev'd in part,* 884 A.2d 26 (Del.2005).

The defendants contend that the revenue projections for 2012 were unreliable and highly speculative. In support of this position, they cite evidence regarding Occam's standard forecasting practice: (i) Occam disclosed revenue and earnings guidance only for the next fiscal quarter and did not provide annual guidance and (ii) management only prepared an annual operating plan, which was approved by the Board, and projections for the upcoming four quarters. They argue that the April Projections were intended as an aggressive forecast, they were not designed to form the basis for financial planning, and had the April Projections been intended for planning purposes, Sharer would have "been more conservative." Sharer Tr. at 168–69. They argue that the June Projections and August Projections were simply updates to the aggressive April Projections and suffer from the same flaws. Finally, they cite testimony that management did not have confidence in the 2012 projections, that management "would not have advised Jefferies to use 2012 [financial projections] for their fairness [opinion,]" *see* Seeley Tr. at 275, and that the 2012 projections were not presented to, reviewed by, or approved by the Board or shared with Calix and its bankers, *see* Defs.' Mot. Ex. 95; Seeley Tr. at 287–88.

The plaintiffs cite countervailing evidence that the revenue projections for 2012 were reliable and not speculative. The plaintiffs' evidence suggests that the April Projections, June Projections, and August Projections were carefully created and vetted by management and that the June Projections were adjusted for "reasonableness." The plaintiffs also point out that Jefferies relied on 2010 and 2011 projections that were created side-by-side with the 2012 projections and that Jefferies was, in fact, provided projections for 2012, but later told to disregard them. In

addition, the plaintiffs cite evidence suggesting that Seeley coordinated with Jefferies on the projections for 2010–12, and as part of that process, she refreshed the management projections for 2010–12. Finally, plaintiffs cite evidence suggesting that the June Projections were shared with the Board.

At this procedural stage, the court is not permitted to weigh the conflicting evidence to determine the reliability of the 2012 projections. Viewing the facts in favor of the plaintiffs, the court cannot determine as a matter of law that the 2012 projections were unreliable and, thus, immaterial. Summary judgment is denied as to this disclosure claim.

### 2. Whether The Proxy Statement Accurately Described Management's 2011 Projections

 The plaintiffs next take issue with the Proxy Statement's description of management's projections for 2011 and contend that the description is inaccurate and misleading. "In addition to the traditional duty to disclose all facts material to the proffered transaction, directors are under a fiduciary obligation to avoid misleading partial disclosures." *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del.1996). "Once defendants travel down the road of partial disclosure[,] they have an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events." *Id.* (internal quotation marks omitted). Additional disclosure may be required if "the omission of a related fact renders the partially disclosed information materially misleading." *Id.* at 1057. "When a document ventures into certain subjects, it must do so in a manner that is materially complete and unbiased by the omission of material facts." *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 448 (Del.Ch.2002). Even if the addi-

tional information independently would fall short of the traditional materiality standard, it must be disclosed if necessary to prevent other disclosed information from being misleading. *Johnson*, 2002 WL 31438477, at *4.

The Proxy Statement asserted that "[t]he internal financial projections represent Occam's evaluation of its future financial performance on a stand-alone basis, and without reference to whether the proposed merger transaction will be consummated." Defs.' Mot. Ex. 1 at 106. The plaintiffs contend that this assertion did not accurately represent what the internal financial projections incorporated. The plaintiffs cite evidence suggesting that the August Projections included reductions to the June Projections in anticipation of Calix's acquisition of Occam and the likely subsequent loss of the TDS account. The defendants disagree with this characterization and with the evidence regarding the August revisions.

There is evidence to support the plaintiffs' position. Viewing the facts in favor of the plaintiffs, the court cannot hold as a matter of law that Proxy Statement's description of management's 2011 projections was accurate. Summary judgment on this claim is denied.

### 3. Whether The Jefferies Fairness Opinion Accurately Described The Information Received From Occam Management

 The plaintiffs next argue that the Jefferies fairness opinion, which was included in the Proxy Statement, falsely described the information provided to Jefferies by Occam's management. The fairness opinion stated that Jefferies reviewed "certain information furnished to [it] by the Company's management, including financial forecasts *for calendar years 2010 and 2011 only, having been advised by man-*

*agement of the Company that it did not prepare any financial forecasts beyond such period,* and analyses, relating to the business, operations and prospects of the Company." Defs.' Mot. Ex. 1 at B–1 (emphasis added). Management prepared three sets of projections: the April Projections, June Projections, and August Projections. All three included financial forecasts for 2012. All three were reviewed by Seeley. The April Projections and June Projections were reviewed by Howard–Anderson, and he also received an early version of the August Projections. Jefferies was provided with the August Projections, which included financial forecasts for 2012.

The defendants contend that the three sets of projections were not intended as financial forecasts and that the 2012 projections were sent to Jefferies accidentally. The plaintiffs cite evidence suggesting that the 2012 projections were reliable, that Seeley and Howard–Anderson were both aware of the 2012 projections, and that Jefferies received a copy of the 2012 projections alongside the 2010 and 2011 projections that it ultimately relied upon in rendering the fairness opinion.

At this procedural stage, the court cannot rule as a matter of law on the accuracy of the italicized portion of the Proxy Statement's description of the information Jefferies's relied upon for its fairness opinion. There is evidence suggesting that this disclosure was false. Summary judgment on this claim is denied.

### 4. Whether The Proxy Statement Accurately Described The Sale Process

██ The plaintiffs contend that the Proxy Statement offered a misleading description of the sale process. The plaintiffs have amassed extensive evidence indicating that the background section more closely resembled a sales document than a fair and balanced factual description of the events leading up to the Merger Agreement. The evidence suggesting a slanted and misleading approach to the background section is particularly troubling because the defendants asked the court to take judicial notice of the contents of the Proxy Statement and rely on its factual accuracy both for purposes of a motion to dismiss and in connection with the preliminary injunction hearing. In response to the defendants' motion for summary judgment, the plaintiffs focus in on three aspects of the background section: (i) Occam's early contacts with Calix, (ii) Occam's negotiations with Adtran, and (iii) the 24–hour market check. Viewed in the light most favorable to the plaintiffs, the evidence gives rise to questions of fact about each of these aspects of the Proxy Statement.

The plaintiffs argue that the Proxy Statement failed to disclose information about Occam's contacts with Calix in early 2009, which disguised the fact that Calix had always been Occam's preferred bidder. A proxy statement does not need to disclose every detail about early discussions with potential acquirers. Where "arm's-length negotiation has resulted in an agreement which fully expresses the terms essential to an understanding by shareholders of the impact of the merger, it is not necessary to describe all the bends and turns in the road which led to that result." *Van de Walle,* 1991 WL 29303, at *15. Early contacts that do not lead to more formal negotiations or a transaction are not required to be disclosed. *See State of Wis. Inv. Bd. v. Bartlett,* 2000 WL 238026, at *8 (Del.Ch. Feb. 24, 2000) ("One can not conclude that a failure to disclose the details of negotiations gone south would be either viably practical or material to shareholders in the meaningful way intended by

our case law."). In this case, however, the early contacts with Calix may have been more than "bends and turns in the road." At this procedural stage, the court cannot rule as a matter of law that this information was immaterial.

The plaintiffs also argue that the Proxy Statement falsely portrayed Adtran as an "equivocal" and unresponsive suitor. The Proxy Statement stated that Adtran "informed representatives of Jefferies that it had determined it would not continue discussions with respect to an acquisition of Occam" and described Adtran's purported "determination to discontinue further discussions after over a year of sporadic communications on the topic." Defs.' Mot. Ex. 1 at 84, 91. The plaintiffs cite evidence showing that Adtran had, and continued to have, real interest in Occam and stopped discussions only because it perceived Occam's 24–hour ultimatum as breaking off the negotiations. The defendants contend that the characterization of Adtran as an equivocal and unresponsive suitor was accurate. The court cannot resolve this factual dispute on a motion for summary judgment or rule as a matter of law that the information was immaterial.

Finally, the plaintiffs contend that the Proxy Statement and supplemental disclosures failed to fully disclose details about the 24–hour market check. The plaintiffs cite evidence suggesting that it was the Board, not Jefferies, who ordered the 24–hour market check. The plaintiffs argue that disclosing this information would have informed stockholders that the Board had already settled on Calix and was simply going through the motions with other bidders. The defendants disagree, arguing that the Board determined that a market check should be done quickly, then relied on Jefferies to carry out the directive. The defendants contend that all material

information was disclosed. The court cannot resolve this factual dispute or rule as a matter of law that the information was immaterial. Summary judgment on the disclosure claim is denied.

### 5. The Possibility Of A Damages Recovery

The defendants argue that because the Merger closed, and because it was not a short-form merger or a merger involving a controlling stockholder, it is no longer possible for this court to award a remedy for a breach of the duty of disclosure, warranting summary judgment in their favor. That is an incorrect statement of current Delaware law. *See In re Orchard Enters., Inc. S'holder Litig.,* 2014 WL 1007589, at *32–43 (Del.Ch. Feb. 28, 2014) (surveying Delaware decisions). If the plaintiffs prove at trial that the defendants committed a non-exculpated breach of the fiduciary duty of disclosure, then damages can be awarded using a quasi-appraisal measure. *See id.*

### 6. The Exculpatory Defense To The Disclosure Claim

As with the sale process claim, the director defendants invoke the Exculpatory Provision. The "duty of disclosure is not an independent duty, but derives from the duties of care and loyalty." *Pfeffer v. Redstone,* 965 A.2d 676, 684 (Del.2009); *accord Malpiede,* 780 A.2d at 1086 ("[T]he board's fiduciary duty of disclosure, like the board's duties under *Revlon* and its progeny, is not an independent [duty] but the application in a specific context of the board's fiduciary duties of care, good faith, and loyalty."). The Exculpatory Provision bars any damages recovery for disclosure claims resulting from a breach of the duty of care.[23]

---

**23.** *See, e.g., In re Transkaryotic Therapies, Inc.,* 954 A.2d 346, 360 (Del.Ch.2008) ("[W]here a

It is not clear at this stage whether the disclosure violations in the Proxy Statement resulted from a breach of the duty of loyalty or the duty of care. There is evidence in the record that would support a finding that the directors knew about the June Projections, which were not disclosed. To the extent the directors knew about the June Projections, which included a forecast for 2012, they also were in a position to know that Jefferies's fairness opinion falsely stated that Occam did not prepare financial forecasts for any year after 2011.

The directors also were in a position to review critically and correct the Proxy Statement's relatively breezy and high-level description of the background of the Merger. The evidence in the record supports an inference that the Proxy Statement misleadingly de-emphasized the extent of Occam's focus on Calix and mischaracterized aspects of Occam's discussions with Adtran.

Other disclosure problems in the Proxy Statement include descriptions of actions taken by particular directors. For example, the Proxy Statement omits some communications between Krausz and Russo and describes others incorrectly. During his deposition Krausz admitted that particular details in the Proxy Statement were wrong, such as the description of an industry conference where he talked with Russo about a strategic transaction. Just as he was able to recognize this error in his deposition, Krausz should have recognized and corrected it before signing off on the Proxy Statement.

Problems that occurred in discovery have caused the court to be skeptical about the defendants' arguments regarding their disclosures. During the injunction phase, by letter dated November 5, 2010, defense counsel represented that the defendants would produce "non-privileged documents and electronically-stored information ... related to Occam's negotiation and decision to enter into the merger agreement with Calix, Inc. and Occam's evaluation of alternatives to the merger," including projections and other categories of documents that were considered by the Board or Occam's executive management team. Despite this undertaking, the defendants did not produce any documents referring to projections for the year 2012 until after the Merger was consummated. Two years later, beginning in October 2012, the defendants produced an additional 103 spreadsheets and emails chronicling the development of the projections. Jefferies also withheld spreadsheets and emails referring to the projections, many of which have not yet been produced despite evidence in defendants' production that Jefferies received the relevant documents.

breach of the disclosure duty does not implicate bad faith or self-interest, both legal and equitable monetary remedies (such as rescissory damages) are barred on account of the exculpatory provision authorized by 8 *Del. C.* § 102(b)(7)."); *In re Tyson Foods, Inc. Consol. S'holder Litig.,* 919 A.2d 563, 597–98 (Del. Ch.2007) ("A decision violates only the duty of care when the misstatement or omission was made as a result of a director's erroneous judgment with regard to the proper scope and content of disclosure, but was nevertheless made in good faith. Conversely, where there is reason to believe that the board lacked good faith in approving a disclosure, the violation implicates the duty of loyalty." (footnote omitted)); *see also Zirn,* 681 A.2d at 1061–62 (holding that the directors were shielded from liability by the Section 102(b)(7) provision in the company's certificate of incorporation because the record reflected "that any misstatements or omissions that occurred were made in good faith" because the "directors lacked any pecuniary motive to mislead the [company's] stockholders intentionally and no other plausible motive for deceiving the stockholders [had] been advanced").

Defense witnesses denied the existence of the 2012 projections when testifying during the injunction phase. Krausz testified repeatedly that projections for 2012 did not exist. So did Howard–Anderson, even though he participated in preparing the 2012 projections. Jefferies's Rule 30(b)(6) witness similarly testified that Jefferies had not been given projections for 2012, when the record now indicates that Jefferies received them. The defendants' answering brief in opposition to the preliminary injunction cited this testimony, stating: "But plaintiffs do not and cannot dispute that Occam has not prepared projections for 2012 because there were too many uncertainties." Dkt. 47 at 49.

Under the circumstances, the court will not grant the director defendants' motion for summary judgment on the disclosure claims based on the Exculpatory Provision. *See Frank,* 2014 WL 957550, at \*35 ("[B]ecause the Court cannot presently determine who was informed of what surrounding the [material information], the Court also cannot conclude whether the failure to disclose ... is appropriate or not or whether this disclosure implicates loyalty or good faith concerns."). The confounding evidence of the directors' knowledge and the problems that occurred in discovery prevent the court from inferring at this procedural stage that the directors acted in good faith. It is desirable to inquire into and develop the facts more thoroughly at trial before determining whether and to what degree the Exculpatory Provision applies. *See Mentor Graphics,* 1998 WL 731660, at \*3.

## C. Occam As A Defendant

 Occam is named as a defendant, but none of the complaint's counts proceed against Occam. The complaint asserts claims for breach of fiduciary duty. It is the fiduciaries serving the entity who owe fiduciary duties; the entity that is served does not. *In re Wayport, Inc. Litig.,* 76 A.3d 296, 322–23 (Del.Ch.2013); *see also A.W. Fin. Servs., S.A. v. Empire Res., Inc.,* 981 A.2d 1114, 1127 n. 36 (Del.2009). Occam is not a proper defendant.

## III. CONCLUSION

At the injunction stage, the court was able to weigh the evidence and competing inferences when determining whether the plaintiffs had a reasonable probability of success on the sale process claims. After trial, the court again will able to weigh the evidence and choose among competing inferences. At present, the evidence viewed in the light most favorable to the plaintiffs supports an inference that certain decisions fell outside the range of reasonableness. Notwithstanding this ruling, because of the Exculpatory Provision, summary judgment is entered on the sale process claims against the plaintiffs and in favor of defendants Krausz, Abbott, Bylin, Pardun, Strom, and Moyer. Judgment also is entered in favor of Occam. Otherwise, the motion for summary judgment is denied.